# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 29, 2005 Session

## STATE OF TENNESSEE v. KEVIN HUNTER BIGGS

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 244715    Jon Kerry Blackwood, Senior Judge, Sitting by**
**Designation for the Honorable Stephen M. Bevil**

---

**No. E2005-01402-CCA-R3-CD - Filed August 25, 2006**

---

A Hamilton County Criminal Court jury convicted the defendant, Kevin Hunter Biggs, of one count of aggravated sexual battery, a Class B felony. The trial court sentenced the defendant to eight years in the Department of Correction to be served at one hundred percent as a child rapist.[1] The defendant appeals, claiming (1) that the successor trial judge was not qualified to act as thirteenth juror; (2) that the trial court erred in failing to include attempted aggravated sexual battery as a lesser included offense; (3) that the state withheld exculpatory information from the defendant in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963) and Rule 16 of the Tennessee Rules of Criminal Procedure; (4) that the designated trial judge erred in concluding the defendant's newly discovered evidence was not likely to change the result of the trial; and (5) that the trial court erred in admitting irrelevant and highly prejudicial character and hearsay testimony. Concluding that the successor trial judge could not act as the thirteenth juror, we reverse the judgment of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Reversed and Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. THOMAS T. WOODALL, J., filed a dissenting opinion.

Leslie A. Cory, Chattanooga, Tennessee, (on appeal); Stuart Brown, Chattanooga, Tennessee, (at trial), for the appellant, Kevin Hunter Biggs.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; William H. Cox, III, District Attorney General; Mary Sullivan Moore and Yolanda Mitchell, Assistant District Attorneys General, for the appellee, the State of Tennessee.

---

[1]We note that the judgment form reflects the defendant was classified as a child rapist, however he should have been classified as a violent offender. See T.C.A. §§ 39-13-523, 40-35-501(i)(1).

**OPINION**

This case relates to the defendant's being charged with touching a four-year-old relative. A Hamilton County grand jury indicted the defendant for rape of a child, a Class A felony. The jury convicted the defendant of the lesser included offense of aggravated sexual battery.

At the trial, Stephanie Howard testified that on November 30, 2002, she and her family went to the defendant's house for a belated Thanksgiving dinner. She said that she and the defendant were related by marriage and that it was a family gathering. She said that everyone was "hanging around" the kitchen preparing the meal and that the defendant was sitting in the living room. She testified that her daughter, the four-year-old victim, was also in the living room watching television. She said the defendant was wearing a bathrobe, as he frequently did around the house. She said she noticed the living room was quiet and left the kitchen to check on her daughter. She said that when she entered the living room, she saw her daughter standing on one end of the couch with her pants pulled down and her vagina exposed. She said the defendant was leaning forward and "his head was parallel with her [daughter's] exposed parts."

Ms. Howard testified that she asked the defendant what he was doing and that he "nearly flipped off the couch he jumped so hard . . . . He knew he'd been caught." She said the defendant replied that he was doing "nothing" to the victim. She said that she did not see the defendant touch the victim. She said she asked the victim why her pants were down and that the victim said the defendant told her to take her pants off. She said that she asked the victim what the defendant was doing to her and that the victim responded, "He licked my fanny." She said that at that point, everyone in the house had come into the living room. She said that everyone heard the victim say that the defendant licked her fanny. She testified that the victim told her she needed to go to the bathroom and that she went with the victim. She said the defendant denied touching the victim, repeatedly saying, "I didn't do it." She said that the victim could not have "made up" the abuse, because she "had no knowledge of that type of thing."

Ms. Howard testified that she, her husband, and the victim left the defendant's home and went to Ms. Howard's parents' house. She said her husband questioned the victim in the car to try and determine exactly what had happened. She said that on the following day, she and her husband returned to the defendant's house to confront him. She said that she and her husband intended to kill the defendant and had purchased a 20-gauge shotgun for that purpose.

Ms. Howard testified that they had almost reached the road leading to the defendant's house when they saw the defendant driving his truck down the road toward them. She said that her husband said, "Stop him, stop him" and that she pulled the car into the defendant's lane and forced the defendant to stop his truck. She said her husband exited the car and went to the window of the defendant's truck. She said the defendant was "double-talking like crazy" and trying to convince her husband not to kill him. She testified that they eventually agreed to go to the defendant's house to talk. She said that the defendant went to the store and that she and her husband went to the defendant's house. She said that when the defendant returned to the house approximately forty-five

2

minutes later, he tried to explain to them that he did not do anything to the victim. She said an argument ensued between the defendant and his wife. She said that the defendant's wife was "truly going at him, physically" and that the defendant then left the house. She said, "[W]e talked about it for just a few minutes and . . . everyone in the household agreed, call the police. So we called the police."

On cross-examination, Ms. Howard acknowledged that before she called the police, she had approximately three beers to calm herself down. She said that she did not call the police, the hospital, or any crisis center when the incident occurred because she did not know what to do and did not know anyone who had experience dealing with child sexual abuse. The police report showed that Ms. Howard did not question her daughter about what had happened until they returned home. The report did not describe the manner in which Ms. Howard discovered her daughter and the defendant. Ms. Howard said that the report was incorrect and that she asked the victim what was happening immediately upon seeing the victim with her pants down. She said that despite the omissions in the police report, her testimony at the trial was an accurate account of how she found the defendant and the victim. She said that it was normal for the defendant to wear a robe around the house but that she did not know the defendant was not wearing anything underneath it until approximately two months after she gave her statement to the police. She said that she found out that the defendant had exposed himself to the victim on several different occasions. She said that she learned this information "when people started talking and people started telling things that had been said to them by [the defendant's] wife, who had caught him doing this."

Geoffrey Howard, the victim's father, testified that at the time of the incident, he and the defendant were friends and had been "pretty close" for several years. He said that he worked for the defendant for approximately one year and that he lived with the defendant while he and his wife were separated. He said the defendant's wife, Diane Biggs, was his aunt. He said that on the evening of the incident, he was in the kitchen at the defendant's house when his wife began screaming that the defendant had "touched" the victim. He testified that he "freaked out for a minute and then everybody ran to the living room and was questioning him what [sic] he had done." He said that the defendant denied touching the victim in her vaginal area, claiming that he "licked her belly." He said the victim was scared and looked like she was going to cry. He said he took the victim into the kitchen and asked what the defendant had done to her. He said she responded, "He touched my fanny." He said that he asked how the defendant "touched her fanny" and that the victim responded, "His tongue."

Mr. Howard testified that they left the defendant's home and that on the way home, the victim repeatedly asked, "Why did he do that to me?" He said that he and his wife went back to the defendant's house the day after the incident in order to confront the defendant. He said that he and his wife wanted to kill the defendant and that they had taken steps toward accomplishing that goal. He testified that on their way to the defendant's house, they saw the defendant driving his truck and that they ran the defendant "out of the road [and] tried to get him out of his truck." He said the defendant said, "You can beat the hell out of me if you want to, but I didn't do anything." He said that the defendant then left in his truck and that they went to the defendant's house. He said that when the defendant returned home, "[h]e stayed there long enough for [the defendant's wife] to hear

3

what he done [sic], and everybody started fighting, throwing stuff, and he left." He said they called the police that evening while he, his wife, the defendant's wife, Drew Biggs, Steve Sharp, and Angel Grimes were there. He said that he had been working for the defendant at the time of the incident but that he had not returned to work for him since that time.

On cross-examination, Mr. Howard said that when the incident occurred, he never thought about taking the victim to the hospital or calling 9-1-1. He said they did not call the police until approximately 5:30 p.m. the day after the incident. He admitted he was drinking on the day they called the police, but he could not remember exactly what time he started drinking. He admitted that his statement to the police was not accurate. He said that although his written statement to the police said that the defendant's robe was open and the defendant's penis was visible, he actually meant that the defendant had a visible erection that could be seen through the robe.

On re-direct examination, Mr. Howard said he never actually threatened to kill the defendant when he and his wife ran the defendant off the road. On re-cross examination, Mr. Howard admitted that he and the defendant had "heated words," that he was angry when they ran the defendant off the road, and that he tried to pull the defendant out of his truck.

The victim testified that the defendant touched her "fanny." Using an anatomical diagram of a child, the victim pointed to the vaginal area of the diagram to show where her fanny was located. She said that the touching occurred in the living room at the defendant's house and that the defendant touched her fanny with his tongue. She said the defendant also touched her fanny with his hand. The victim said that her panties were pulled down when the defendant touched her and that the defendant told her not to tell her mother.

On cross-examination, the victim said that before testifying, she spoke to the prosecutor and to her mother about what had happened. She said that if she got "stuck" telling her story, the prosecutor would help her out. She also said that her mother helped her remember what happened and explained to the victim how to tell her story.

Hamilton County Sheriff's Detective Robert Starnes testified that he responded to the call from the victim's parents. He said that when he reached the defendant's house, the victim's parents and the defendant's wife were present at the scene along with a few other individuals. He said he was told the abuse had occurred in the living room. He said that the defendant was not present, having left the scene before the police were called, and that the victim was not present. He said the victim was later interviewed by a forensic interviewer at the Children's Advocacy Center in Hamilton County. He said that Child Protective Services and law enforcement officers observed the interview via a video monitor.

Detective Starnes testified that there was no visible bruising or injury to the victim's vaginal area. He said he did not order a medical examination to be conducted on the victim, because based on his experience, any delay in obtaining evidence generally results in evidence being destroyed. He said that the only possible evidence in this case would have been saliva, but that he did not believe

any DNA evidence would be available twenty-four hours after the abuse. He said that there is frequently no physical evidence in child sexual abuse cases.

Rodney Fisher testified that he had been a private investigator for two years, and before that, he had worked for the United States Marshals Service. He said he was hired by defense counsel to interview witnesses involved in this case and collect evidence in an effort to determine what happened. He said he took measurements of the inside and outside of the defendant's house. He said the distance from the kitchen to the living room was seventeen feet and eight inches.

Hamilton County Sheriff's Deputy Robin Langford testified that on December 1, 2002, she responded to a call at the defendant's house. She said that when she arrived, the witnesses explained that they had found the defendant in the living room with the four-year-old victim whose pants were down. She said that after leaving the defendant's home and returning to their own house, the victim's parents asked the victim about what had happened. She said that it was at that time that the victim told her parents that the defendant "had touched her private area with his tongue."

Melanie Barton testified that she worked for the Hamilton County Board of Education, specifically with special education, mentally retarded, and Down Syndrome children. She said she also worked with foster children and was a foster parent. She said that on December 1, 2002, the defendant's wife called upset and asked Ms. Barton to come to her home. She said she arrived at the defendant's home between 9:30 a.m. and 10:00 a.m. She said that about one hour after she arrived, everyone, except herself, started drinking beer. She said the defendant's wife and the victim's parents explained to her what had happened. She said that she suggested four or five times that they call the police because they were very upset and threatening to kill the defendant and because of the possibility that the victim had been abused. She said it was her understanding that the victim's mother had taken the victim to the bathroom shortly after the incident and that it was at that time that the victim said the defendant had licked her fanny.

The jury convicted the defendant of the lesser included offense of aggravated sexual battery. The trial judge, Judge Stephen M. Bevil, accepted the jury's verdict. Because of illness, Judge Bevil was unable to conduct the sentencing hearing and the motion for new trial hearing. Judge Doug Meyer presided at the sentencing hearing and sentenced the defendant to eight years to be served at one hundred percent in the Department of Correction. Senior Judge Jon Kerry Blackwood presided over the motion for new trial hearing and denied the defendant's motion.

The defendant raises five issues on appeal including (1) whether the successor trial judge conducting the motion for new trial, who did not preside at the trial, erred in ruling he could sufficiently familiarize himself with the trial record in order to determine the credibility of the state's witnesses and act as thirteenth juror in approving the jury verdict; (2) whether the trial court erred in failing to include attempted aggravated sexual battery as a lesser included offense in the jury charge; (3) whether the state's refusal to provide the defendant with a copy of the victim's interview at the Children's Advocacy Center violated Brady or Rule 16 of the Tennessee Rules of Criminal Procedure; (4) whether the successor trial judge at the motion for new trial hearing erred in

concluding the defendant's newly discovered evidence was not likely to change the result of the trial; and (5) whether the trial court erred in admitting irrelevant, highly prejudicial, and impermissible character and hearsay testimony by Stephanie Howard.

## I. THIRTEENTH JUROR

The defendant argues that the successor trial judge at the hearing on the motion for new trial improperly concluded that he could sufficiently familiarize himself with the record and act as the thirteenth juror. The defendant argues that in a case such as this, when there is no physical evidence, the entire role of the trial judge as thirteenth juror is to assess the credibility of witnesses. He contends it is impossible to make credibility determinations solely from a review of the record. He asserts that "[w]here credibility is the overriding factor in the determination of guilt or innocence, only the trial judge can serve as thirteenth juror." He cites several cases in support of his argument that conclude that because the judge presiding at the trial did not act as the thirteenth juror, the conviction should be reversed and the case remanded for a new trial.

The state contends the trial court properly denied the defendant's motion for a new trial and properly acted as thirteenth juror. The state asserts the successor judge announced that he reviewed the entire record and familiarized himself with the record to the extent necessary to serve as the thirteenth juror. The state asserts the successor judge gave a summary of the witnesses' testimony and found that there was no basis to attack the credibility of the witnesses and that none of the witnesses' testimony was contradicted. The state also contends that nothing in the record shows that the trial court was dissatisfied with the guilty verdict reached by the jury. The state asserts that the trial judge "heard the entire trial, he sat as the [thirteenth] juror, he got to see the credibility of the witnesses, and he agreed with the verdict."

Rule 33(d)[2] of the Tennessee Rules of Criminal Procedure provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The rule "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). Our supreme court has held that the rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995).

In this case, the original trial judge was unable to preside over the hearing on the motion for new trial due to illness. Tennessee Rule of Criminal Procedure 25(b) addresses situations when the trial judge is unable to perform post-verdict duties due to absence, sickness, death, or other disability. The rule provides in pertinent part,

---

[2]We note that the Tennessee Rules of Criminal Procedure were reformatted on July 1, 2006, which changed Rule 33(f) to Rule 33(d) but did not change the substance of the rule.

(b) After Verdict of Guilt. –

(1) In General. –After a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence, death, sickness, or other disability.

(2) Granting a New Trial. –The successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason.

Tenn. R. Crim. P. 25(b).

Although Rule 33(d) does not explicitly require a statement on the record indicating that the trial court has carried out its duty as the thirteenth juror, our supreme court has said the duty is mandatory in every case. State v. Brown, 53 S.W.3d 264, 274 (Tenn. Crim. App. 2000) (citing Carter, 896 S.W.2d at 122). In this regard, the court has stated that when a trial court overrules a motion for new trial without comment, an appellate court may presume that the trial court approved the verdict as the thirteenth juror, even when the weight of the evidence is not raised in the motion. Carter, 896 S.W.2d at 122. On the other hand, when a trial court comments on the record about its thirteenth juror determination, the ruling should be clear and unequivocal. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

This court has previously concluded that "a successor judge's consideration, pursuant to Rule 25(b) [of the Tennessee Rules of Criminal Procedure] of whether the duties of the original judge can be met must include an assessment of his or her ability to act as a thirteenth juror, including witness credibility." State v. Nail, 963 S.W.2d 761, 765 (Tenn. Crim. App. 1997) (citing State v. Bilbrey, 858 S.W.2d 911, 914 (Tenn. Crim. App. 1993)). "In assessing whether the successor judge can act as thirteenth juror, the judge would need to determine the extent to which witness credibility was a factor in the case and the extent to which he had sufficient knowledge or records before him in order to decide whether the credible evidence, as viewed by the judge, adequately supported the verdict." Brown, 53 S.W.3d at 275. If the successor judge is unable to make these determinations, the judge cannot approve the verdict and a new trial must be granted. Id. (citing Nail, 963 S.W.2d at 766). A judge who is first exposed to the case when called to preside over a motion for new trial may rule on the motion if the record is available as long as witness credibility is not an overriding issue. Id. When witness credibility is the primary issue raised in the motion for new trial, the successor judge may not approve the judgment and must grant a new trial. Id.

First, we will address the state's assertion that the original trial judge sat as the thirteenth juror by agreeing with the verdict. When the jury returned with the verdict, the trial judge asked the jury foreperson to read the verdict. The trial judge then stated:

7

> If that's the verdict of each and every one of you on the jury, would you so indicate by raising your right hand, please? All right. Thank you. Would you pass those papers for me?
>
> . . . .
>
> All right. Would you stand, please, Mr. Biggs? Mr. Biggs, based on the finding of the jury that you are guilty of the lesser-included offense of aggravated sexual battery, it is the judgment of the Court that you are guilty of aggravated sexual battery.

This court has previously stated that "we may only consider the statements of the trial judge made in passing on the motion for new trial in our review of the trial judge's actions as thirteenth juror." State v. Dale Nolan, No. 01C01-9511-CC-00387, Sequatchie County, slip op. at 28 (Tenn. Crim. App. June 26, 1997) (citing Cumberland Tel. & Tel. Co. v. Smithwick, 112 Tenn. 463, 467-68, 79 S.W. 803, 804 (1903)). However, we do not believe that Nolan forecloses the satisfaction of the trial court's role as thirteenth juror at any time after the verdict other than at the motion for new trial hearing when a trial court makes a statement that is a clear approval or disapproval of that verdict. See Carter, 896 S.W.2d at 122 (holding the trial court carried out its duty as the thirteenth juror when ruling on the defendant's motion for judgment of acquittal). In the present case, though, we do not view the trial judge's statement to be an agreement with the jury's verdict or a clear statement of its approval or disapproval of the verdict. We conclude that the trial judge's statement in front of the jury was not enough to satisfy the judge's role as the thirteenth juror. See State v. Ernest L. McCormick, No. 01CO1-9502-CC-00027, Rutherford County, slip op. at 9 (Tenn. Crim. App. Oct. 4, 1995) (concluding that the trial judge acted as thirteenth juror because the judge stated, "I accept that verdict," upon the jury's return of the guilty verdict and the judge stated at the motion for new trial hearing that he believed the state proved the defendant's guilt beyond a reasonable doubt).

Next, we address the crux of the defendant's argument that the successor judge erroneously concluded that he could sufficiently familiarize himself with the written record in order to act as the thirteenth juror and approve the jury's verdict. "Given the statement made by our supreme court regarding the purpose of the thirteenth juror rule, it is difficult to see how a trial judge who has not heard the evidence and who has not seen the witnesses can act as the thirteenth juror when weight and credibility are issues." Brown, 53 S.W.3d at 275. "When a trial judge is asked to review the weight and credibility of the evidence as the thirteenth juror based upon a written record, the trial judge 'is in no better position to evaluate the weight of the evidence than an appellate court.'" Id. (quoting Moats, 906 S.W.2d at 435). The appellate courts have no independent authority to act as thirteenth juror. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993).

This case involved accusations by the victim and her parents and a denial of any wrongdoing by the defendant, with no physical evidence present. Witness credibility was an overriding issue in this case. The jury chose to accredit the testimony of the victim and her parents. However, the successor judge was not at the trial to see any of the witnesses testify and would have been unable to

make a credibility determination from the written record. A successor judge cannot rule on a motion for a new trial if witness credibility is an overriding issue. See Brown, 53 S.W.3d at 275. We conclude that the successor judge could not act as the thirteenth juror in this case because credibility was an overriding issue. We reverse the judgment of the trial court and remand this case for a new trial.

## II. LESSER INCLUDED OFFENSES

The defendant next argues that the trial court erred in failing to charge the jury on attempted aggravated sexual battery as a lesser included offense of rape of a child. The defendant contends that the evidence supported the charge of attempted aggravated sexual battery and that the trial court was required to instruct the jury to consider the lesser included offense. The defendant asserts that the trial court instructed the jury regarding the lesser included offenses of aggravated sexual battery, child abuse, and assault. He argues that if the trial court found the evidence sufficient to instruct the jury as to those lesser included offenses, then the evidence was likewise sufficient for a charge of attempted aggravated sexual battery.

The state contends that because the evidence of the convicting offense shows that the offense was completed, an instruction on the lesser included offense of attempt was not required. The state asserts there was no evidence presented that the defendant attempted to lick the victim's "fanny" but was unsuccessful in completing the offense. The state contends that reasonable minds could not have accepted the victim's testimony as demonstrating mere attempt.

Absent a written request for an instruction on lesser included offenses, the failure of the trial court to instruct the jury on any lesser included offenses is not available as a ground for relief either in a motion for new trial or on appeal. T.C.A. § 40-18-110(c). Because the defendant failed to file a written request asking the trial judge to instruct the jury on the lesser included offense of attempted aggravated sexual battery, he waived this issue on appeal unless it rises to the level of plain error. See State v. Page, 184 S.W.3d 223, 226 (Tenn. 2006) (concluding that issues concerning jury instructions on lesser included offenses which were not requested in writing at the time of trial pursuant to Tennessee Code Annotated section 40-18-110(c), may still be reviewed on appeal under the plain error doctrine). Therefore, we must determine if the failure to give an instruction on attempted aggravated sexual battery rises to the level of plain error.

Rule 52(b) of the Tennessee Rules of Criminal Procedure provides:

> (b) Plain Error. – When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

See also T.R.A.P. 36(b). Our supreme court has adopted the factors developed by this court to be considered

9

when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).  In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial."   Adkisson, 899 S.W.2d at 642.

In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), our supreme court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser included offense:

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

10

> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67.

If an offense is a lesser included offense, then the trial court must conduct the following two-step analysis in order to determine if the lesser included offense instruction should be given:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469.

If a trial court improperly omits a lesser included offense instruction, then constitutional harmless error analysis applies and this court must determine if the error did not affect the outcome of the trial beyond a reasonable doubt. State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001). "In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002).

The defendant was charged with the offense of rape of a child. The trial court properly instructed the jury on aggravated sexual battery as a lesser included offense. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003) (providing that State v. Elkins, 83 S.W.3d 706, 713 (Tenn. 2002), recognized that aggravated sexual battery is a lesser included offense of rape of a child). Under part (c) of the Burns test, "an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense" is a lesser included offense of the charged offense. Burns, 6 S.W.3d at 466-67. Therefore, attempted aggravated sexual battery is a lesser included offense of rape of a child.

Having determined that attempted aggravated sexual battery is a lesser included offense of rape of a child, the next step is to determine if the evidence in the record supports charging the offense. Aggravated sexual battery, in this instance, is defined as the "unlawful sexual contact with a victim by the defendant or the defendant by a victim" if "[t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). Attempt is defined as follows:

11

        (a)      A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

           (1)     Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

           (2)     Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

           (3)     Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

        (b)      Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

T.C.A. § 39-12-101(a), (b).

At the trial, the victim testified that the defendant touched her "fanny" with his tongue and with his hand. Using a diagram, the victim identified her vaginal area as her "fanny." The victim's mother testified that when she entered the living room, she saw that the victim's pants were pulled down and that the defendant's head was parallel to the victim's vagina. The victim told her mother that the defendant told her to pull her pants down. The victim then told her mother that the defendant "licked my fanny." The defendant denied it saying, "I didn't do it, I didn't do it." The victim's father testified that the victim told him that the defendant had touched her "fanny" with his tongue. He said the defendant's response was that he did not do anything. When asked if the defendant gave an explanation about what had happened, both the victim's mother and father testified that the defendant said he licked the victim's belly.

An attempt instruction is not required if the only proof presented was proof of the completed crime as opposed to an attempt. See State v. Marcum, 109 S.W.3d 300, 304 (Tenn. 2003); see also State v. Stokely J. U. Way, No. E2002-00251-CCA-R3-CD, Cocke County, slip op. at 16-17 (Tenn. Crim. App. Feb. 9, 2004) (concluding attempted rape instruction not necessary because the only evidence presented was the victim's testimony that the defendant penetrated her). The victim's parents testified that the defendant said he licked the victim's belly. We conclude this was sufficient to raise the issue of an attempt. However, we believe it would not lead to a new trial.

The defense theory of the case was that the defendant did not touch the victim, as demonstrated through the defendant's closing argument:

> And before I start going over the evidence, there are lesser charges. And the judge will instruct you, you may find one, but you may not find another. I want to tell you here and today he is either guilty of rape or he is guilty of nothing. There is no half maybe, there's no let's give him something when there's not enough evidence to give him rape. He's either guilty or he's not; he either touched that child or he didn't.

Additionally, the victim testified that the defendant licked her vagina. The victim's mother testified that when she walked into the room her daughter's pants were down, and the defendant's head was parallel with the victim's vagina. The victim's parents testified the victim told them that the defendant had licked her vagina. Therefore, we conclude that beyond a reasonable doubt the failure to instruct on attempted aggravated sexual battery did not affect the outcome of the trial. The defendant is not entitled to relief on this issue.

### III. BRADY VIOLATION AND TENNESSEE RULE OF CRIMINAL PROCEDURE 16 VIOLATION

Before trial, the state did not provide the defendant with a copy of the summary of the forensic interview conducted with the victim at the Children's Advocacy Center. The defendant asserts that the summary contained exculpatory evidence and as such, failure to disclose the information constituted a Brady violation, as well as a violation of Rule 16 of the Tennessee Rules of Criminal Procedure. Additionally, the defendant argues that he was deprived of an opportunity to investigate the extent to which the victim's testimony was tainted as a result of her interview. The state argues the information was neither exculpatory nor material, and therefore, there was no Brady violation. The state also argues that pursuant to Rule 16(a)(2) of the Tennessee Rules of Criminal Procedure and Tennessee Code Annotated section 37-1-612, the information was not discoverable.

The summary of the forensic interview was placed under seal in the trial court and submitted as part of the record on appeal. Portions of the forensic interview summary were published in the presentence report and became a public record once the report was filed. The record reflects that the presentence report was not filed until July 8, 2004, after the trial was concluded. Therefore, the defendant was unaware of the content of the forensic interview until after the close of proof.

#### A. Brady Violation

In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97. In order to establish a due process violation under Brady, four prerequisites must be met:

1.      The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2.      The State must have suppressed the information;

3.      The information must have been favorable to the accused; and

4.      The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995); see also, State v. Evans, 838 S.W.2d 185 (Tenn. 1992).

The defendant has the burden of proving a constitutional violation by a preponderance of the evidence. State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993). Demonstrating a constitutional violation requires the defendant to show that without the omitted material he has been denied the right to a fair trial. United States v. Agurs, 427 U.S. 97, 108, 96 S. Ct. 2392, 2399 (1976).

Assuming that the defendant demonstrates the first three elements of a Brady violation, he must still show the materiality of the omitted material. The United States Supreme Court has held that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995) (citing United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383-84 (1985)). As stated by the United States Supreme Court:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles, 514 U.S. at 434, 115 S. Ct. at 1566 (citing Bagley, 473 U.S. at 678, 105 S. Ct. at 3381). In other words, the inquiry is whether we can be confident that the jury's verdict would have been the same if the state had disclosed the favorable evidence to the defendant. Id. at 453, 115 S. Ct. at 1575.

In Bagley, the Supreme Court explained that constitutional error results in the withholding of "material" evidence, and materiality exists when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S. at 682, 105 S. Ct. at 3383. The "materiality" of suppressed, favorable evidence was discussed at length in Kyles and Johnson v. State, 38 S.W.3d 52 (Tenn. 2001). Those cases identify four aspects

14

of materiality. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles, 514 U.S. at 434, 115 S. Ct at 1566; see also Johnson, 38 S.W.3d at 58. Second, when determining the materiality of suppressed information, the trial court should not conduct a sufficiency of the evidence test. Kyles, 514 U.S. at 434, 115 S. Ct. at 1566; Johnson, 38 S.W.3d at 58. As the Supreme Court stated in Kyles, "One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435, 115 S. Ct. at 1566. Third, once it has been determined that a constitutional violation occurred, there is no reason to conduct a harmless error analysis. Id.; Johnson, 38 S.W.3d at 63. Finally, the materiality of the suppressed evidence should be "considered collectively, not item by item." Kyles, 514 U.S. at 436, 115 S. Ct. at 1566. This means the state's obligation to disclose the evidence is left solely to the prosecutor who has "the responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." Id. at 420, 115 S. Ct. at 1558. Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435, 115 S. Ct. at 1566; see Johnson, 38 S.W.3d at 58.

We have reviewed the presentence report and the sealed documents containing the original summary of the forensic interview. A comparison of the summary and presentence report revealed that, with few exceptions, almost all of the information contained in the summary is also included in the presentence report.

Based upon information from the interview included in the presentence report, the defendant contends that the state should have disclosed before the trial that during the forensic interview, the victim stated that the defendant did not touch her with anything other than with his tongue. At the trial, the victim testified that the defendant touched her with both his tongue and his hand. The defendant argues that the jury would not have convicted him of aggravated sexual battery had it known that he did not touch the victim with his hand. He also argues that he should have been made aware of the fact that the victim identified her stomach as a place where a "bad touch" occurs, because this is consistent with his contention that he tickled and blew on her stomach. The defendant argues that had he known the victim considered her stomach a place where "bad touching" occurred, he might have developed his explanation of the events that occurred as part of his defense that he did not touch the victim in a sexual manner.

Although the state's failure to disclose the summary of the interview precluded the jury from considering this information, we cannot conclude that the defendant suffered a constitutional violation. The victim's statements identify the defendant as the perpetrator who licked her vagina. Whether the defendant also used his hand to touch the victim is unnecessary for a jury to find the defendant guilty of aggravated sexual battery. Much of the information in the summary of the presentence report, including that the victim touched the defendant's private part "long long ago," is extremely inculpatory information that was not developed at the trial. As such, confidence in the

15

verdict is not undermined by the fact that the victim gave conflicting statements about the defendant touching her vagina with his hand. Accordingly, we hold that the state's failure to disclose to the defendant the summary of the forensic interview was not a violation of the defendant's due process rights pursuant to <u>Brady</u>. The defendant is not entitled to relief on this issue.

B. Tennessee Rule of Criminal Procedure 16 Violation

The defendant also argues that the state's failure to disclose the forensic interview summary violated Rule 16 of the Tennessee Rules of Criminal Procedure which governed pretrial discovery of evidence. In pertinent part, the rule provided as follows:

> (a)    Disclosure of Evidence by the State.
>
> (1)    Information Subject to Disclosure
>
> . . . .
>
> (C)    Documents and Tangible Objects. – Upon request of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, and which are material to the preparation of the defendant's defense or are intended for use by the state as evidence in chief at the trial, or were obtained from or belong to the defendant.
>
> (D)    Reports of Examinations and Tests.– Upon request of a defendant the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

(2)     Information Not Subject to Disclosure. – Except as provided in paragraphs (A), (B), and (D) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law enforcement officers in connection with the investigation or prosecution of the case, or of statements made by state witnesses or prospective state witnesses.

Tenn. R. Crim. P. 16(a)(1)(C) & (D), (a)(2) (2004).

Rule 16 allows for pretrial discovery of tangible objects and reports of examinations and tests but prohibits the pretrial discovery of statements by state witnesses. The defendant claims that the statements by the victim to the forensic interviewer were not "statements made by [a] state witness" as contemplated by Rule 16 of the Tennessee Rules of Criminal Procedure and therefore were subject to disclosure. In this assertion, the defendant is correct.

Tennessee Rule of Criminal Procedure 26.2 governs the production of witness statements. Rule 26.2 provides that on motion of a party who did not call the witness, the trial court shall order the opposing party "to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Tenn. R. Crim. P. 26.2(a). Under Rule 26.2, the state has no obligation to provide a defendant with a copy of a witness statement until after the witness has testified. Id.; see also State v. Taylor, 771 S.W.2d 387, 394 (Tenn. 1989) (holding that there is "no constitutional requirement that the State provide witnesses' statements prior to trial. The State has no obligation to produce statements of a witness until the conclusion of the witness' testimony on direct examination."). Rule 26.2(f) defines "statement" as follows:

(1) A written statement that the witness makes and signs, or otherwise adopts or approves; or
(2) A substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement.

The summary does not meet the definition of a "statement" under Rule 26.2 because it is not signed or adopted by the victim, and it is not a verbatim recording of what the victim said. As such, the state had no obligation to produce the summary under Rule 26.2.

However, because Tennessee Code Annotated section 37-1-612 makes reports of child sexual abuse confidential, we do not reach the question of whether the summary is subject to disclosure under Rule 16. T.C.A. § 37-1-612(a), (b). Although the statute identifies exceptions to the prohibition against production of child sexual abuse reports, this court has held that production to

17

individuals accused of child sexual abuse is not among the exceptions. See T.C.A. § 37-1-612(b)(1)-(7); State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997); State v. Clabo, 905 S.W.2d 197, 201 (Tenn. Crim. App. 1995). The defendant, who is accused of child sexual abuse, wanted access to the interview to obtain inconsistencies in the victim's statements. However, we conclude that the defendant was not entitled to those records and that he is not entitled to relief on this issue.

## IV. NEWLY DISCOVERED EVIDENCE

The defendant next argues that the trial court erred in denying his motion for new trial based on newly discovered evidence. He contends that newly discovered evidence that Geoff Howard purchased a gun on December 3, 2002, indicates that Ms. Howard perjured herself at the trial. He asserts Ms. Howard testified that because they were extremely upset about what had happened to their daughter, she and Mr. Howard purchased a gun on December 1, 2002, and went to the defendant's house to kill him. The defendant argues that because the only evidence against him is testimonial, the importance of the witnesses' credibility is magnified. The defendant argues that the fact that the Howards falsified a significant aspect of their testimony is relevant because it makes it more probable that their allegations against the defendant were false. He also contends that the state's reliance on this perjured testimony played a major role in the jury's determination of guilt. The defendant argues that if he had been able to impeach Ms. Howard's testimony, the jury might have returned a verdict of not guilty.

The state responds that the trial court did not abuse its discretion in denying the defendant's motion for a new trial. The state contends that the "newly discovered evidence" could have only been used for impeachment purposes, that it did not meet the standard for newly discovered evidence, and that it would not have changed the outcome of the trial. The state also contends that Ms. Howard's testimony about when she purchased the firearm is irrelevant to the issues at the trial.

The decision to grant or deny a new trial on the basis of newly discovered evidence is a matter that rests in the sound discretion of the trial court. State v. Goswick, 656 S.W.2d 355, 358 (Tenn. 1983). However, a new trial is a matter of right only when the defendant establishes (1) reasonable diligence in seeking newly discovered evidence, (2) the materiality of the evidence, and (3) that the new evidence is likely to change the result of the trial to one more favorable for the defendant. State v. Bowers, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) (citing State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993)). When newly discovered evidence merely tends to contradict or impeach the trial evidence, a new trial is not always warranted. State v. Sheffield, 676 S.W.2d 542, 544 (Tenn. Crim. App. 1984). On appeal, our standard of review is abuse of discretion. State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

At the trial, Ms. Howard testified that she was extremely upset by what had happened to her daughter and that she purchased a shotgun from Benton Shooter Supply with the intent of killing the defendant. Although a jury may have inferred that the shotgun was purchased the day after the incident, Ms. Howard never expressly stated that she bought the shotgun on that day. In connection with his motion for new trial, the defendant submitted an affidavit from his trial attorney declaring

18

that he did not investigate before the trial the Howards' purchase of a shotgun. The trial attorney stated that he did not investigate the purchase because he had no knowledge that a shotgun had been purchased in connection with the defendant's case and had no reason to anticipate that Ms. Howard would testify that she purchased a shotgun for the purpose of killing the defendant.

The defendant also submitted an affidavit from a court-appointed private investigator stating that the investigator had no knowledge of the purchase of the shotgun and had no reason to know a gun had been purchased in connection with the defendant's case. After the trial was over, the investigator retained a copy of the ATF Firearms Transaction Record from Benton Shooter Supply, which reflected that Mr. Howard purchased a shotgun on December 3, 2002. The defendant also submitted an affidavit declaring he had no personal knowledge that the Howards had purchased a shotgun for the purpose of killing him. Testimony at the hearing on the motion for new trial established that Benton Shooter Supply was not open on Sundays and therefore could not have been open on December 1, 2002, the day after the incident.

As evident by its denial of the motion for new trial, the trial court did not find the newly discovered evidence "so crucial to [the defendant's] guilt or innocence" that admitting the evidence would have resulted in the defendant being acquitted. See Singleton, 853 S.W.2d at 496. We cannot conclude that the trial court abused its discretion. The defendant is not entitled to relief on this issue.

## V. STEPHANIE HOWARD'S TESTIMONY

The defendant asserts that the trial court erred in admitting impermissible character evidence and hearsay testimony by Stephanie Howard. He argues (1) that Ms. Howard should not have been allowed to testify regarding the other witnesses' reactions to the incident, and (2) that Ms. Howard should not have been allowed to testify regarding an argument that the defendant had with his wife the day after the incident. He contends that the testimony was introduced for the purpose of showing that the defendant's wife believed he was capable of child sexual abuse. He argues that the testimony was impermissible character evidence under Rule 404(a) of the Tennessee Rules of Evidence. He contends that the court improperly admitted the evidence under the excited utterance exception to the hearsay rule. See Tenn. R. Evid. 803(2). He also contends that the testimony was highly prejudicial and should have been excluded because it was irrelevant to the question of whether the defendant committed the crime. See Tenn. R. Evid. 403.

The state contends the trial court properly allowed Ms. Howard to testify about the defendant's wife's reaction to hearing that the defendant had molested the victim. The state argues that the statements by Ms. Howard were not hearsay but that they would have been admissible under the excited utterance exception to the hearsay rule. The state also contends that Ms. Howard could testify about the fight between the defendant and his wife because Ms. Howard's testimony about what she observed was neither character evidence nor hearsay.

The defendant cites the following portions of the record in support of his argument.

19

| | |
|---|---|
| [MS. HOWARD]: | I said, "What are you doing to my daughter?" again. He, [said] "Nothing, nothing." And I just asked [the victim], I said, "[victim], why were your pants down?" And she said, "He told me to pull them down." And I said, "Well, why did he tell you to pull them down, what did he do? What is he doing to you?" And she said, "He licked my fanny." |
| [PROSECUTOR]: | Now, is everybody else in the house still in the other room at that point? |
| [MS. HOWARD]: | At that point they're running from the kitchen to see what's going on in the living room. |
| [PROSECUTOR]: | Okay. So there was enough raised level in the voices that they became aware something was happening in the living room? |
| [MS. HOWARD]: | Yes. |
| [PROSECUTOR]: | So who all came into the living room at that point? |
| [MS. HOWARD]: | Everybody. Noah came from his closed door in the bedroom, he'd been getting dressed, he came from in there. Diane and Geoff came from the kitchen. And they were all, everybody was just stunned, I mean nobody -- |
| [PROSECUTOR]: | Okay. Did anybody ask you what was going on? |
| [MS. HOWARD]: | Yeah, Diane said, "What's going on?" You know, what was going on in here. And I told her what [the victim] had just said. |

[PROSECUTOR]: And was Geoff present at that point when you were telling her what you had seen and what had just been said?

[MS. HOWARD]: Yes.

[PROSECUTOR]: And so tell me about the reactions of the different people, just one at a time, whether you want to start with Geoff or Diane, tell me how each of them reacted when they heard this.

[DEFENSE COUNSEL]: Your Honor, objection. They would be the best witness to be called and told about how they reacted and what they said.

[PROSECUTOR]: Well, actually, Your Honor, I'm asking her to describe what was occurring in the living room at this point. Not necessarily what was said, but were people calm, were they upset, what's happening, how people are reacting.

THE COURT: All right. I'll overrule it, I'll allow it. Proceed.

[PROSECUTOR]: Go ahead.

[MS. HOWARD]: My husband was just kind of stunned. I mean if you've ever heard anybody say that they had the deer in the headlights look, that was my husband, he just was, he was mortified. He was stunned, he was shocked, he was scared. He was just standing there. I mean, you know, he was scared.

[PROSECUTOR]: And how was Diane reacting?

[MS. HOWARD]: At first, she was very inquisitive to [the victim] and to myself and to Kevin.

21

[PROSECUTOR]: So she was asking the two of you questions?

[MS. HOWARD]: She didn't say what did you do. "Why did you do that to her," is what she said to Kevin.

[DEFENSE COUNSEL]: Your Honor, again, I'm going to object to what she said.

[PROSECUTOR]: All right. Sorry , we'll move on from that.

THE COURT: All right. Sustain objection.

[PROSECUTOR]: Geoff is just sort of starring, stunned, and Diane starts asking questions of everybody, is what's happening[.]

[MS. HOWARD]: Yes, ma'am.

[PROSECUTOR]: And what's Noah doing?

[MS. HOWARD]: He's just standing there. He can't believe it either, but -- he does believe it, but he's just standing there like --

[DEFENSE COUNSEL]: Your Honor, objection.

THE COURT: Sustain.

[MS. HOWARD]: – he couldn't believe it was happening in the house.

[PROSECUTOR]: Okay. And what is [the victim] doing when this is going on?

[MS. HOWARD]: [The victim] had to go to the bathroom immediately.

[PROSECUTOR]: Okay.

[MS. HOWARD]: She had to go to the restroom.

[PROSECUTOR]:        So did someone take her to the restroom?

[MS. HOWARD]:        Yes.

[PROSECUTOR]:        Who took her to the restroom?

[MS. HOWARD]:        I led her to the restroom, and it was just right off from the living room area where we were. So I let her go in there and I closed the door and I stood outside the door and waited for her to finish, and then she was just in there for a second and came back out.

[PROSECUTOR]:        And so, now, during all of this going on, does the defendant ever say anything?

[MS. HOWARD]:        Not really. Only, "I didn't do it, I didn't do it."

[DEFENSE COUNSEL]:        Your Honor, may I object? Again, she's testifying to what he said, and that's going to be hearsay, and he's going to testify.

[PROSECUTOR]:        No, its's not, Your Honor.

THE COURT:        Okay. She can testify as to what he said. I'll overrule that objection.

[PROSECUTOR]:        All right. If you will continue, what was the defendant saying?

[MS. HOWARD]:        He was saying, "I didn't do it, I didn't do it," with my four-year-old daughter standing right there in his face saying, "Yes, he did, yes, he did."

[PROSECUTOR]:        And did he try to offer any explanation at any point about what was happening?

23

| | |
|---|---|
| [MS. HOWARD]: | He did. |
| [PROSECUTOR]: | And what did he say? |
| [MS. HOWARD]: | His first immediate response was, "I didn't lick her fanny, I licked her belly, I licked her belly." And at that point I, you know, why is he licking my four-year-old baby, period. |
| [PROSECUTOR]: | Okay. So did you guys stay there much longer after this? |
| [MS. HOWARD]: | No. |
| [PROSECUTOR]: | What did you do? |
| [MS. HOWARD]: | I grabbed up my baby and my husband before my husband grabbed a hold of him and we got out of there. I was just mortified. I didn't know what to do, what to say. I mean I knew this had happened, because my four-year-old daughter could not have made that up. She had no knowledge of that type of thing at all. |
| | . . . . |
| [MS. HOWARD]: | When [the defendant] came back, he came into the living room and he sat down and he started trying to say that he didn't do this, he didn't do that. And then he and Diane got into an argument about it, right in front of both of us, and she started asking him about other things. |
| [DEFENSE COUNSEL]: | Your Honor, Your Honor? |
| [PROSECUTOR]: | Okay. So did they end up getting into a fight? |

24

THE COURT:              Wait a minute.    [The prosecutor], there's an objection.

[PROSECUTOR]:           Oh, I'm sorry.

[DEFENSE COUNSEL]:      May we approach, Your Honor?

THE COURT:              You may, yes.

(Thereupon, the following bench conference was had out of hearing of jury:)

[DEFENSE COUNSEL]:      I'm not sure what the total legal objection is, Your Honor, but she's getting into a lot of things that's going to–may get into them arguing. And, also, she's saying what everybody else is saying. Let them testify as to hearsay.

[PROSECUTOR]:           If I could respond, Your Honor. First of all, I'm the one who's been very careful to avoid the pornography.

[DEFENSE COUNSEL]:      You have. She has.

[PROSECUTOR]:           All my witnesses are aware and my questions are tailored. I'm not going to be opening the door. Second of all, I am very clear they can't testify to what anybody else said but the defendant, and I am trying to keep her on track on just the defendant's comments, okay? But the defendant and his wife did get into a fight and there were things the defendant said, okay? And I'm not sure if [defense counsel] is clear, but the defendant's statements are not hearsay.

THE COURT:              Yeah, they are statements of an adverse party, so they can, it is admissible.

25

| [DEFENSE COUNSEL]: | I wasn't aware of that. |
|---|---|
| THE COURT: | Go ahead and proceed. She does appear to be trying to avoid the hearsay. |
| [PROSECUTOR]: | All my witnesses are aware to stay away from the pornography, and I'm trying to keep her on track. |
| [DEFENSE COUNSEL]: | Well, good luck. |
| [PROSECUTOR]: | You know, she has a right to be upset. |

(Thereupon, the bench conference was concluded.)

The defendant objected to various parts of Ms. Howard's testimony on the grounds that the statements were hearsay. The trial court properly ruled on those objections. The defendant did not object to the evidence as unfairly prejudicial or as impermissible character evidence. The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion. State v. Dubose, 953 S.W.2d 648, 652 (Tenn. 1997); see also Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Hearsay is not admissible unless an exception to the hearsay rule applies. Tenn. R. Evid. 802.

We also note that the defendant did not refer to excited utterance as grounds for admitting the testimony as an exception to the rule against hearsay. In order to preserve an issue for appeal, the defendant must object contemporaneously and identify the reason for his objection. See Tenn. R. Evid. 103(a)(1) (providing that timely objection for purposes of preserving the issue for appeal must state "the specific ground of objection if the specific ground was not apparent from the context"). We have previously held:

> The purpose of Rule 103(a)(1) is to enable meaningful appellate review of a trial court's evidentiary rulings. According to the rule, the objecting party has the burden of placing on the record the reasons for an objection. Tenn. R. Evid. 103(a)(1)&(2). While the rule provides different requirements for situations in which the evidence is excluded or admitted, in both instances, the objecting party has the duty to state the specific basis for the objection.

State v. Dale L. Courtney, No. 03C01-9406-CR-00195, Greene County, slip op. at 5 (Tenn. Crim. App. Apr. 11, 1995).

This court further held that:

> Good trial practice and the Rules of Evidence demand that counsel state the basis for an objection when the objection is made and that opposing counsel be given the opportunity to respond. Not only does this "make the record" for appellate review, but it encourages adequate preparation on the part of counsel so that meaningful objections and responses may be made. Trial judges should encourage the practice.

Id. slip op. at 6.

The failure to identify the grounds for the objection in this case constitutes waiver. See T.R.A.P. 36(a), Advisory Commission Comments ("The last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error."); see also State v. Smith, 24 S.W.3d 274, 279-80 (Tenn. 2000); Hill v. State, 513 S.W.2d 142, 143 (Tenn. Crim. App. 1974) (stating that to allow evidentiary questions to be raised at anytime would "undercut the very function of the trial process, for it would become a tactical matter of defense to allow a bit of constitutionally inadmissable evidence into the record, in the hope for an acquittal but secure in the knowledge that a new trial would result"). Accordingly, the defendant is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing and the record as a whole, we reverse the judgment of the trial court and remand the case for a new trial consistent with this opinion.

_____
JOSEPH M. TIPTON, JUDGE

27