IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 7, 2010

**STATE OF TENNESSEE v. JOE McKNIGHT**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-03301     W. Otis Higgs, Jr., Judge**

**No. W2010-00688-CCA-R3-CD  - Filed March 1, 2011**

The defendant, Joe McKnight, was convicted by a Shelby County Criminal Court jury of aggravated robbery, a Class B felony, and sentenced to ten years as a Range I offender in the Department of Correction. On appeal, he argues that (1) the trial court erred in allowing the State to question defense witness, Dr. Joseph Angelillo, about the defendant's prior criminal history; (2) the trial court erred in allowing the State to lead its witness, Stanley Johnson; (3) the trial court erred in admitting co-defendant Stanley Johnson's statement to authorities into evidence; and (4) the evidence was insufficient to sustain his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, Joe McKnight.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephen P. Jones and Summer Morgan, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the robbery of Rodrigo Rivas, the victim, while Rivas was visiting an acquaintance's apartment on September 26, 2007. As a result, the defendant and two co-defendants, Stanley Johnson and Demetria Nelson, were indicted for aggravated robbery. Johnson and Nelson both pled guilty, and the defendant proceeded to trial.

**State's Proof**

At the defendant's trial, the victim testified that on September 26, 2007, he arrived home from a long day at work to discover that the electricity was out in his apartment building. He left to go to a friend's apartment nearby so he could charge his cell phone, take a bath, and cool off from the heat. However, his friend was not home, and after waiting an hour, the victim returned home. The victim recalled that he then received a phone call from Demetria Nelson, one of the co-defendants, a woman he had met once and spoken with on the phone in the past. Nelson told the victim that she wanted to spend time with him. The victim saw her invitation as an opportunity for him to charge his phone, take a bath, have some place cool to spend the night, and possibly have sex.

The victim arrived at Nelson's apartment and the two spent some time talking until Nelson asked if he would buy some alcohol. They went to a nearby liquor store and then returned to Nelson's apartment. When they returned, Nelson began behaving strangely by "going to the bathroom to make a call every two minutes and then she would close the doors in the bathroom, in the dark." The victim found Nelson's behavior to be very frustrating; however, he assumed she wanted to have sex, so he took off his pants. Nelson turned off the lights and television and "jumped on top of" the victim like she was going to have sex with him. At that time, the victim heard the door open, and Nelson "jumped off of [him] on the side of the bed . . . and [he] saw two males."

The victim testified that one of the men hit him repeatedly with what appeared to be an aluminum baseball bat, while the other searched for the victim's pants. The victim later discovered that the item he was hit with was a three-foot tall aluminum flower vase. The two men left only after the victim acted as though he had been knocked out. Nelson left before the two men. The victim then called 911 and waited for the police to arrive.

The victim testified that he sustained bruises "all the way down [his] legs and [his] arms" and dislocated a bone in his finger as a result of the beating. His attackers stole his pants, which contained his wallet, credit cards, driver's license, and $850 in cash. Although the victim was not able to discern the facial features of his attackers, he was able to tell that they were both black and that one appeared to be approximately 5'8" or 5'9" and the other approximately 5'5" or 5'6". He thought that the taller man weighed 165 to 175 pounds, and the shorter man weighed 155 to 160 pounds. The victim later gave a statement to the police and looked at photographic arrays, out of which he identified Nelson.

Otis Kilpatrick testified that he was with Stanley Johnson the evening of September 26, 2007, when Johnson received a phone call from Demetria Nelson who told Johnson, "I've got some money for you." After the call from Nelson, Johnson called Timothy Smith,

also known as "Booger," to pick him up. Smith arrived, and Kilpatrick, Johnson, and the defendant got into the car. Johnson directed Smith to an apartment on Adams or Washington Avenue in downtown Memphis. When they arrived, Johnson called Nelson and asked if she was at home. Nelson said that she was not home yet, so the four men waited for ten to fifteen minutes. Nelson called back and told Johnson that she was "just coming up the stairs, come up here and get the money." Johnson asked for someone to accompany him, and the defendant went with Johnson while Kilpatrick and Smith waited in the car.

Kilpatrick testified that he saw Johnson and the defendant go inside the apartment, and then he and Smith started to drive away to get something to eat. Before they had driven a block, Johnson called and "told us to come get them." As they arrived, Kilpatrick saw the defendant and Nelson, who was "pulling up her clothes," run out of the apartment. The defendant and Nelson informed the others that Johnson was "around the corner" and when they picked him up, Johnson explained that they had robbed someone. Nelson handed Johnson a wallet, and Johnson "got his money out and [Nelson] gave it back to [the defendant] and [the defendant] gave [Kilpatrick and Smith] $20.00 a piece." Nelson asked the defendant why he hit the victim in the head with a vase, but the defendant did not respond. After a few stops, Nelson was eventually dropped off at a motel and the four men returned to their homes.

Kilpatrick testified that he was later contacted by the police and gave a statement. He also identified Nelson, whom he did not know before the night of the incident, from a photographic array. He also identified a photograph of the defendant.

Stanley Johnson, who pled guilty to aggravated robbery in the present case, testified that the defendant was his "home-boy" and that the two of them were together the evening of September 26, 2007. However, the defendant was not with him at the time of the robbery; he, Nelson, and the victim were the only ones in the room.

Johnson admitted that he was not happy about being called as a witness in the case. He acknowledged that he gave a statement to police and that he was shown his statement prior to taking the stand. He did not alert that anything in his statement was incorrect, and he had agreed that his answer to the question asking him to describe the events prior to, during, and after the robbery was accurate. However, he now alleged that what was written in the statement was not all his words – the officers "added their own detail to it." The description of the events relayed in his statement that:

> [Nelson] called [the defendant]'s phone and told him to come over there
> because she had something for him. Me, [Smith], [the defendant], and
> [Kilpatrick] drove over there in [Smith]'s car. I went up there to holler at

[Nelson] when the [victim] came, they went to the back. [The defendant] came back and was talking to [Nelson] on the phone and he went to the back and the next thing I know is the [victim] is hollering. I ran back down and [the defendant] was hitting the man and [Nelson] was hollering, she wasn't trying to stop him. I ran down the steps and [the defendant] and [Nelson] came out of the house after me. I called [Smith] and told him to pick me up and by that time he had already had [the defendant] and [Nelson] in the car. I got in the car and [the defendant] had gave me $60.00 and he gave [Nelson] $60.00.

After reciting the events from his statement, however, Johnson again claimed that what was written was not what he had told the officers even though he had signed at the bottom of his statement that it was true and correct.

Johnson's statement to police was entered into evidence. Johnson maintained that many of the answers in his statement, including those indicating that the defendant participated in the robbery and that the defendant was a member of a gang, were either lies or answers made up by the police officers. Johnson said that he had told the officers that he "did everything" but that was not in his statement.

Demetria Nelson, who pled guilty to aggravated robbery in the present case, testified that on September 26, 2007, she was living in an apartment on Adams Avenue. She, Johnson, and the defendant were together that night, and they planned the robbery of the victim. She and the victim went to the liquor store, while Johnson and the defendant hid in the bathroom. Upon their return from the liquor store, she and the victim went into her bedroom, and she shut the door, turned on the radio, and turned off the light and television. She proceeded to go "in and out of the bathroom," and then five to ten minutes after she returned to the bedroom, Johnson and the defendant ran into the bedroom.

Nelson testified that when they entered the bedroom, the defendant hit the victim with a vase and Johnson grabbed the victim's pants. Nelson told the defendant to stop hitting the victim because she "didn't know it was going to go like that" and the victim was "hollering . . . like he was in pain." Nelson said, "Let's go," and the three of them left the apartment as she was still putting on her clothes. They met up with Kilpatrick and Smith, who was driving the car, and the group went to a couple of different places together. At Johnson's grandmother's house, Johnson "pulled everything out" that was taken from the victim and split it among the five of them. Nelson eventually stayed at a motel that night, and "everybody else went their separate ways."

Nelson testified that she was later contacted by the police, and she gave a statement.

However, the statement was not true in that she gave false names about who was involved in the robbery with her. She gave false information because she "was more afraid" in that "this was [her] first serious crime." Nelson was later confronted by the officers with information that the names she had given them were false, and she "felt bad and . . . went on and told the truth." She told the officers that the defendant and Johnson were involved in the robbery and that the defendant hit the victim with a vase. She identified a photograph of the defendant for the officers. She said that the vase the defendant used to hit the victim was from her apartment. Nelson stated that Johnson was lying if he testified that only she and he robbed the victim. Nelson testified that Roderick Smith was an ex-boyfriend of hers who lived with her at one time.

Stanley Johnson's attorney testified that she and Johnson met with the prosecutor the previous day and were informed that Johnson would be called as a witness at the defendant's trial. The prosecutor had Johnson read the statement he had given the police, after which Johnson acknowledged that it was his statement and that nothing in it was incorrect.

Detective Michael Rosario with the Memphis Police Department testified that he was assigned the case involving the aggravated robbery of the victim, and Demetria Nelson was developed as a suspect. Detective Rosario met with the victim on October 5 and had him look at a photographic array and give a statement. The victim identified Nelson from the array. Nelson was located and brought to the police station for questioning, and she gave a statement. She also consented to a search of her apartment, from which two vases were recovered. One of the vases was dented. The other vase was not dented and contained bamboo or reeds wrapped in cellophane. Fingerprints of Roderick Smith were located on the cellophane wrap, and Nelson's fingerprints were on the dented vase.

Approximately ten days after his first meeting with Nelson, Detective Rosario encountered her again, at which time he confronted her with information that she had not been truthful in her statement in that she implicated a co-defendant who in fact had an alibi. Nelson then gave a second statement wherein she implicated the defendant, Stanley Johnson, and Otis Kilpatrick and identified their photographs. Kilpatrick and the defendant were located and brought in by another officer, and Johnson turned himself in.

Detective Rosario testified that Johnson waived his Miranda rights and gave a statement. Detective Rosario typed Johnson's statement, which Johnson read and then initialed and signed signifying its correctness. In his statement, Johnson said that he was present in the apartment during the robbery but did not participate in it. Johnson stated that the defendant committed the robbery, Nelson set up everything, and Kilpatrick and Smith picked them up afterwards. Johnson stated that the defendant was armed with a vase shaped like a baseball bat that he obtained from Nelson's apartment. He said that the defendant

gave him and Nelson $60 each, but he did not know what the defendant did with the remainder. Johnson also identified himself and the defendant as being affiliated with the Gangster Disciples. Detective Rosario testified that he typed Johnson's words as he spoke, and nothing in the statement was added in by a member of the police department. Johnson also identified photographs of Nelson, Kilpatrick, and the defendant.

Detective Rosario testified that Kilpatrick gave a statement and identified photographs of Nelson and the defendant. After investigation, Kilpatrick was released without being charged. Detective Rosario also spoke with the defendant, and the defendant gave a statement. In his statement, the defendant acknowledged that he was present at the scene when the robbery occurred, but he did not participate in the robbery. He said that Johnson and Nelson committed the robbery. The defendant stated that he was not armed, and he did not know if anyone else was armed. Asked what he received from the robbery, he responded that he received gas money and smoked marijuana that Nelson bought with the money from the robbery. The defendant said that he was affiliated with the "F.A.M., . . . family and money" gang and that his co-defendants were members of F.A.M. as well. The defendant also identified photographs of Nelson, Johnson, and Kilpatrick.

On cross-examination, Detective Rosario acknowledged that none of the individuals he interviewed mentioned anything about the defendant wearing gloves during the incident.

**Defendant's Proof**

Dr. Joseph Angelillo, accepted as an expert in the field of clinical psychology, testified that he conducted an evaluation of the defendant in late October 2009. In conducting his evaluation, Dr. Angelillo reviewed "a great deal of [the defendant's] education records, school records[,] . . . two [or] three psychological, or psycho-educational . . . write-ups[,] . . . [a]s well as copies of, or at least, documentation of some, or perhaps all of his Juvenile Court records." Dr. Angelillo met with the defendant on three occasions, spending approximately seven hours total with him, including the time spent administering various tests. Dr. Angelillo determined that the defendant was mildly mentally retarded. Asked whether someone who was mildly mentally retarded would be able to read and comprehend an advice of rights form, Dr. Angelillo stated that everyone is different, but the Miranda rights are written on a seventh grade level of understanding and the defendant's level of receptive understanding is "well below that," suggesting "that it would be very difficult for him to understand."

On cross-examination, Dr. Angelillo acknowledged that his findings did not mean that the defendant was not capable of committing the crime, answering the questions in his statement, or lying to better his position with the police. Asked whether more exposure to

the advice of rights would make it easier for someone with mental retardation to understand the rights, Dr. Angelillo responded that more exposure would be one consideration in looking at the totality of circumstances and "the more familiar, the more likely there is to be an understanding."

Dr. Angelillo acknowledged that there were similarities in being questioned by a court regarding one's waiver of rights at a guilty plea hearing and in being confronted by police officers regarding one's waiver of rights and giving a statement. Dr. Angelillo further acknowledged that the more individuals have the experience of waiving their rights as an accused in order to plead guilty, the more likely they would be to understand those rights. Asked whether the defendant's experience with the court system as a juvenile and adult made it more likely that he understood his Miranda rights, Dr. Angelillo responded, "I would think so."

The State asked Dr. Angelillo from his listing of "documentation reviewed" about the defendant's previous contacts with the court system and whether those contacts would give him familiarity with the waiver of his rights. Dr. Angelillo admitted that the defendant had been through the juvenile court system seven or eight times and had pled guilty in adult criminal court four or five times. He surmised that each of those contacts made it more likely that the defendant understood his Miranda rights when read by the officers in this case. In sum, Dr. Angelillo said that he could not determine whether the defendant understood the warnings in the advice of rights.

After the conclusion of the proof, the jury convicted the defendant as charged of aggravated robbery.

## ANALYSIS

### I. Questions Concerning Prior Criminal History

The defendant argues that the trial court erred in allowing the State to question Dr. Angelillo regarding the defendant's criminal history. He asserts that he did not "open the door" to his criminal history because Dr. Angelillo was not a character witness and did not form an opinion regarding the defendant's character. He claims that information concerning his prior records was given to Dr. Angelillo for the doctor to get an understanding of his range of intelligence, not form an opinion on his character.

A somewhat detailed recitation of the events at trial is helpful in addressing this issue. On direct examination, the defendant offered the testimony of Dr. Angelillo to address the defendant's competency with regard to his statement to the police officers. On cross-

examination, the State drew the analogy of a defendant's waiver of rights in the court system when pleading guilty to the waiver of rights and giving a statement when questioned by police officers. Dr. Angelillo acknowledged that the more a person went through either of those processes, the more likely it would be for the person to understand those rights. The State asked Dr. Angelillo whether the contacts this specific defendant has had with the court system would make it more likely that he would understand his rights when read to him by the police officers. Dr. Angelillo responded, "I would think so." The State then asked Dr. Angelillo about the factors he considered in evaluating the defendant and the documentation that he reviewed, followed by this colloquy:

[State]: . . . I counted that with the documentation reviewed, the I.E.P.'s that you referred to and the summary of the violations, there were thirteen of those. But, under the records pertaining to legal matters, there were twenty-one of those, correct?

[Dr. Angelillo]: I'll trust you [State], yes.

[State]: Okay. And would you agree that, talking about Juvenile Court now, having gone through the juvenile system in August of '05 -

[Defense Counsel]: Judge --

[State]: Judge, may we approach?

The State then informed the court that it was planning on going through the defendant's juvenile and adult criminal history, including reading the nature of the charge. Defense counsel stated, "[W]e respectfully object," and the State responded that "[i]t is information that [Dr. Angelillo] reviewed in forming his opinion[.]"

After the trial court told the State to continue, the State asked questions about the defendant's previous juvenile contacts and then a lengthy question about whether the defendant was able to understand the Miranda warnings because he had gone through the court system before. Defense counsel objected on the basis of asked and answered, and the court allowed the question. The State later asked Dr. Angelillo about how many times the defendant had pled guilty in adult court, after which, defense counsel requested a bench conference, saying, "[W]e object to this line of questioning." The State began to respond, "He's testified that every time he comes to[,]" but the court interrupted, ruling that it would allow the questions because defense counsel had opened the door. The State proceeded to

-8-

ask about those experiences in the fashion: "[W]ould the fact that he pled guilty on [a given date], for a crime in General Sessions Court, would that make it more likely, or less likely that he understood the rights when the officers read them to him?"

As thoroughly outlined above, the only specific objection the defendant offered was to "asked and answered." Otherwise, the defendant only made general objections to the State's questions and failed to state a specific ground even though the ground was not apparent from the record as required by Rule 103(a)(1) of the Tennessee Rules of Evidence. The failure to state a specific objection would force this court to engage in a complete analysis of the Law of Evidence to discern the various bases for the objections. Thus, the issue was not preserved for our review. See State v. Greene, 929 S.W.2d 376, 380 (Tenn. Crim. App. 1995); see also State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006).

Notwithstanding waiver, the defendant is not entitled to relief. The questioning undertaken by the State was a legitimate cross-examination, testing Dr. Angelillo's testimony concerning the defendant's ability to understand his rights. The probative value of showing the validity of the defendant's statement to police outweighed the danger of unfair prejudice, particularly because the State did not delve into the nature of the defendant's previous charges.

## II. Leading Questions

The defendant argues that the trial court erred in allowing the State to lead its witness, Stanley Johnson. He gave a statement to the police in which he indicated that the defendant participated in the robbery. However, on the witness stand, he testified that only he and Nelson committed the robbery – that the defendant was not involved. The State then asked Johnson about his attorney and whether he had spoken with his attorney and the prosecutor the day of trial, and the defendant objected to leading. The court allowed the question, but the defendant objected to leading a second time when the State asked Johnson whether he remembered agreeing to everything he had said in his statement to authorities. The State explained that Johnson was a hostile witness, and the court allowed the question.

"[T]he propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993). Tennessee Rule of Evidence 611(c) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop testimony. . . . When a party calls a witness determined by the court to be a hostile witness, interrogation may be by leading questions." "Generally, this occurs when the party calling the witness is surprised by the witness' trial testimony and it is contradictory to the witness' pretrial statements." State v. James Alfonso Vaughn, a/k/a Fuzz, No.

-9-

01C01-9612-CR-00523, 1998 WL 255438, at *6 (Tenn. Crim. App. May 21, 1998), <u>perm. to appeal denied</u> (Tenn. Jan. 25, 1999) (citing <u>Floyd v. State</u>, 596 S.W.2d 836, 839 (Tenn. Crim. App. 1979); <u>State v. Darrell Fritts</u>, No. 132, 1992 WL 236152 (Tenn. Crim. App. Sept. 25, 1992), <u>perm. to appeal dismissed</u> (Tenn. Feb. 1, 1993)). The trial court, within its discretion, may decide whether to allow the use of leading questions on direct examination, and its decision will not be reversed absent an abuse of that discretion. <u>Kong C. Bounnam v. State</u>, No. W2001-02603-CCA-R3-PC, 2002 WL 31852865, at *9 (Tenn. Crim. App. Dec. 20, 2002), <u>perm. to appeal denied</u> (Tenn. May 27, 2003) (citing <u>Mothershed v. State</u>, 578 S.W.2d 96, 99 (Tenn. Crim. App. 1978)).

Although the trial court did not officially declare Johnson to be a hostile witness, it is apparent that the court agreed that Johnson was in fact hostile. The record shows that Johnson's testimony on the witness stand was different than that in his statement and that the State was taken by surprise by his changed testimony. We cannot conclude that the trial court abused its discretion in allowing the State to use leading questions.

### III. Co-defendant's Statement

The defendant argues that the trial court erred in admitting Stanley Johnson's statement to police into evidence. He asserts, citing <u>State v. Steve Johnson</u>, No. 02C01-9504-CC-00097, 1997 WL 80970 (Tenn. Crim. App. Feb. 27, 1997), that "[a] party may not impeach its own witness with an out-of-court statement when it is aware that the witness has repudiated its statement."

As noted above, Johnson gave a statement to the authorities incriminating the defendant but then testified at trial that the defendant had nothing to do with the robbery. After arguing to the court that Johnson was a hostile witness and questioning him utilizing leading questions, the State moved to enter Johnson's statement to the authorities into evidence. The defendant objected, arguing that the witness was present to testify. The court overruled the objection and admitted the statement.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. <u>See</u> <u>State v. Gilliland</u>, 22 S.W.3d 266, 270 (Tenn. 2000); <u>State v. Edison</u>, 9 S.W.3d 75, 77 (Tenn. 1999); <u>State v. Cauthern</u>, 967 S.W.2d 726, 743 (Tenn. 1998). Rule 613(b) of the Tennessee Rules of Evidence provides, in pertinent part, that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Our supreme court has held that extrinsic evidence of a prior inconsistent statement is not admissible

unless the witness "either denies or equivocates to having made the prior inconsistent statement." State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998).

In this case, Johnson was afforded the opportunity to explain his position and deny his prior statement. The defendant was afforded the opportunity to cross-examine Johnson but chose not to. Thus, the trial court did not abuse its discretion in admitting the defendant's statement to the authorities under Tennessee Rule of Evidence 613(b). The defendant's reliance on Steve Johnson is misplaced as it addressed a situation where the State was made aware *before the witness testified* that the witness had repudiated his prior statement. Steve Johnson, 1997 WL 80970, at *7-9. In contrast, the record in this case indicates that the State was surprised by Stanley Johnson's repudiation on the witness stand.

## IV. Sufficiency of the Evidence

The defendant lastly challenges the sufficiency of the convicting evidence. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is

insufficient." <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, aggravated robbery is the "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1).

In the light most favorable to the State, the evidence showed that the defendant, Stanley Johnson, and Demetria Nelson initiated a plan to rob the victim in which Nelson lured the victim to her apartment, where Johnson and the defendant were waiting. Nelson seduced the victim in her bedroom, and Johnson and the defendant barged in. The defendant beat the victim repeatedly with a three-foot tall aluminum flower vase, causing the victim to sustain bruises "all the way down [his] legs and [his] arms" and dislocate a bone in his finger. While the defendant was beating the victim, Johnson located and took the victim's wallet, which contained, among other things, $850. The defendant, Nelson, and Johnson shared in the proceeds of the robbery. Any questions concerning the credibility of any of the witnesses were resolved by the jury as the trier of fact. We conclude that a rational trier of fact could have found the defendant guilty of aggravated robbery.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE