IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 19, 2010 Session

## STATE OF TENNESSEE V. TIMOTHY J. TURNER

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-55625     David Bragg, Judge**

---

**No. M2010-00147-CCA-R3-CD - Filed October 31, 2011**

---

Following a jury trial, Defendant, Timothy J. Turner, was convicted of four counts of sexual battery, a Class E felony, and four counts of sexual battery by an authority figure, a Class C felony.  The trial court imposed a sentence of  eighteen months for each count of sexual battery and four years for each count of sexual battery by an authority figure.  The trial court ordered two counts of sexual battery by an authority figure to run consecutively to each other and the remaining counts to run concurrently for an effective eight-year sentence in the Department of Correction as a Range I offender. On appeal, defendant argues: (1) that the original judge failed to perform his role as thirteenth juror; (2) that the trial court erred in refusing to hear his motion for new trial; and (3) that the evidence was insufficient to support his convictions. After a thorough review of the record, we conclude that Defendant's dual convictions for sexual battery and sexual battery by an authority figure in counts five, six, and seven of the indictment violate double jeopardy principles.  We accordingly merge his convictions for sexual battery into his convictions for sexual battery by an authority figure in counts five, six, and seven and remand to the trial court for entry of corrected judgments. We otherwise affirm the judgments of the trial courts, including the effective sentence of eight years imposed by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court
Affirmed in Part, Reversed in Part, and Remanded for Entry of Amended Judgments**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined.  DAVID H. WELLES, SP.J., not participating.

Darwin K. Colston, Murfreesboro, Tennessee (on appeal), and Richard T. Roney and Kathy A. Sittloh, Murfreesboro, Tennessee (at trial), for the appellant, Timothy J. Turner.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General, William C. Whitesell, Jr., District Attorney General; and Laural Hemenway, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Defendant was originally charged in a sixteen-count indictment with eight counts of rape (counts one through eight), four counts of incest (counts nine through twelve), and four counts of sexual battery by an authority figure (counts thirteen through sixteen). The offenses were alleged to have occurred between January 1, 1997, and August 31, 2003. Counts one through four of the indictment alleged rape by unlawful sexual penetration without the consent of the victim; as to the same incidents, counts five through eight alleged rape by unlawful sexual penetration accompanied by the physical helplessness of the victim. The State elected to submit to the jury five discrete incidents of unlawful sexual penetration or contact by Defendant: (1) June of 2003, Defendant entered a room where the victim was sleeping; (2) Easter of 2003 after the family's dog died; (3) after a seventh grade dance when the victim was thirteen years old; (4) during a *Star Wars* movie; and (5) in July of 2003, Defendant again entered the victim's bedroom. Concerning the rape charges, counts one and five related to the first incident in June; counts two and six related to the second incident around Easter; counts three and seven related to the seventh grade dance incident; and counts four and eight related to the *Star Wars* movie incident. Defendant was also charged with incest relating to the first four incidents (counts nine through twelve) and sexual battery by an authority figure for the first three incidents (counts thirteen through fifteen). For the fifth incident in July, Defendant was charged only with sexual battery by an authority figure (count sixteen). The jury convicted Defendant of the lesser-included offense of sexual battery in counts five through eight and sexual battery by an authority figure in counts thirteen through sixteen. He was acquitted of the remaining offenses.

The record reflects that the victim was between thirteen and eighteen years old when all sexual incidents related in this opinion occurred.

At trial, the victim testified that in April of 2003, when she was more than thirteen years old but less than eighteen years old, and around Easter, the family dog died, and everyone was "pretty upset." Her brother wanted her to sleep with him and Defendant that night. The victim testified that her brother slept in the middle of her and Defendant, and when she woke up later that night, her pants were down to her thighs, and Defendant was between her legs with his face "down next to [her] vagina area." She said that his tongue and mouth were touching the outside and inside of her vagina, and she had an orgasm.

-2-

The victim testified that on another occasion in June of 2003, Defendant walked into a room where she was sleeping on the floor. She said that he got underneath the covers and began rubbing her breasts and vagina underneath her clothing. He then placed his fingers inside her vagina, which caused her pain, and he was "breathing hard."

The victim testified that during another occasion around July 4 or 5 of that same year, she was again sleeping on the floor when Defendant walked in and sat down next to her. She testified:

> And he kept raising the cover up so he could look at my, look at my bottom. And I kept pulling the cover down. And he left the room for a little while and came back in, and he went underneath. He got under the covers with me, and he started rubbing on my breasts and my vagina.

She also said that he rubbed the outside of her clothing. The victim testified that she had seen Defendant get sexually aroused when he looked at her on one occasion when he was wearing a towel. She also testified that she had tried to lock the door, but the lock was "kind of broken."

On another occasion, the victim testified that she was lying in the floor with her brother and Defendant watching the movie *Star Wars*. After her brother fell asleep, Defendant performed oral sex on her again. The victim guessed that Defendant thought she was asleep. She said that his tongue touched both the outside and inside of her vagina.

The victim testified that after a dance when she was in the seventh grade, she was at alone with Defendant. She was lying on the couch with her feet in Defendant's lap, and he was massaging her feet. The victim testified that she feel asleep, and when she woke up, Defendant was performing oral sex on her. She said that his mouth and tongue touched both the inside and outside of her vagina.

The victim testified that she first told two of her friends that Defendant would "come in [the] room and rub on [her]." She explained that they all had been talking about things that happened to them, and she thought "that it would be the right time for [her] to tell." The victim testified that she had not previously told anyone what happened because she did not want Defendant in jail and her brother to be upset. The victim also told a relative, Cody, what happened. She said that Cody called her because he dreamed that she was sitting in her room on the floor in front of her mirror crying and cutting herself. Cody asked the victim if anything was wrong, and she told him that it was because of her boyfriend. The victim testified that she told Cody that Defendant was "rubbing on [her] at night." She did not give him or her friends any details of what happened because she was embarrassed. She said that Cody then told his mother what she said, and his mother called the victim's mother. The

victim testified that her mother immediately picked her and her brother up from Defendant's house. During the ride, her mother asked her what happened and if there was any penetration by Defendant. She did not go into the details with her mother at the time. The victim testified that her mother never told her what to say, only to tell the truth.

When she got to her mother's house, the victim decided that she wanted to talk to police. An officer arrived, and the victim told him that Defendant had been molesting her. She told him about the last event when Defendant rubbed the outside of her clothes, and she told him about the marks on her wrist from cutting herself. She explained that she felt "worthless, like nobody loved [her]," and cutting herself made her feel better. The victim testified that her friends and a coach at school had seen the marks on her wrists, and the coach referred her to the school counselor. She told the coach that she cut herself because she had broken up with her boyfriend.

The victim testified that she later talked with Detective Hailey. Her mother and Sharonica Nelson from "DCS or something like that" were also present. They discussed confronting Defendant, and she wanted to confront him in person but Detective Hailey did not think it was a good idea. It was then decided that she would call Defendant. The call was made from the kitchen of her friend's house, and it was recorded. Detective Hailey was in and out of the room during the call asking the victim if she was ok, and writing notes to her. Ms. Nelson was in the livingroom. The victim's mother and brother were in a back room and could not hear what was being said.

The victim testified that she was nervous and really upset during the call, and she told Defendant that she had not talked to police. Concerning the abuse, Defendant said that he did not mean to do anything and "if I did, I'll never do it again." Defendant did not remember doing anything to the victim but admitted that he had a couple of disturbing dreams. He also told the victim that he wanted to get into church. Defendant claimed that he was just being affectionate toward the victim and did not remember doing the things the victim said he had done. He also claimed that he had been "really stressed." Defendant told the victim that he was sorry if he had done anything, and he promised that it would "never happen again." When the victim mentioned specific details of the abuse, Defendant said that he never molested the victim and that he was only "lovin' and huggin' on [her]." Defendant told the victim that he did not remember doing the acts. He also told the victim that he believed her because she always told the truth. Defendant said that he would not drink anymore and that he was "probably drunk." He told the victim that he did not know how she could get help without him going to jail.

The victim testified that no one told her what to say during the call. She later went to the Police Department, talked with Detective Hailey, and "wrote down some statements." She said that she had given a written statement to an officer, but it did not contain all of the

incidents. The victim testified that no one told her what to say in the statements. She did not know that the interview with Detective Hailey was being recorded. At some point, the victim testified that she went to Our Kids Center in Nashville, a sexual abuse center, and was seen there by Sue Ross.

The victim testified that Defendant did not want her seeing her boyfriend, but she still continued to see him. She admitted that she lied to Defendant when he asked if she was still seeing her boyfriend. The victim denied making the phone call to Defendant because she was mad at him over the issue. She also noted that during the phone call with Defendant, he said that she could still see her boyfriend. The victim testified that Defendant allowed her to do lots of things that she liked to do, including skating, and he "never really" disciplined her. She also had friends stay at her house. The victim testified that after moving back in with her mother, they eventually moved into the house where the victim lived with Defendant. The house later had to be sold, and the victim left her school, friends, boyfriend, and skating. The victim testified that Detective Hailey never threatened to put her in jail if she changed her story.

The victim admitted that she and her mother burned many of Defendant's personal belongings in the back yard after his arrest. She said that Defendant signed his van over to her mother while he was in jail, and her stepfather used it for work. The van was eventually sold. The victim testified that she did not help her mother sign Defendant's name to anything. She said that after they moved back into Defendant's house, her mother told her that she was molested by her father. The victim testified that she was allergic to metal, and Defendant would rub cortisone on her stomach. She said that Defendant never threatened her, but she was afraid of him because she has seen him attack her mother on one occasion. The victim also testified that Defendant would sometimes yell at her brother, shake him, throw him on the couch, or slap him on the head. She said, "It wasn't like really bad."

Cody Russell, a relative of the victim, testified that he lived in Texas, and he and the victim had a very close relationship. He called the victim in July of 2003 because he had dreamed that the victim was in her room crying and cutting herself, and he "felt something was wrong." He said:

> You know, I just kept asking her. I was like - - I told her this dream. And she said okay, and she started to talk. She just said before I tell you this, I'm going to leave the room, and you have to promise that you're not going to tell anybody. Don't tell your mom. Don't tell my mom. So, I mean, I'm thinking something with a boyfriend, you know, which I wouldn't have been happy about that, either. And I never expected what I heard, you know.

> She told me that - - she started off to say one time. One time. That he came in after she was asleep and just, you know, laid beside her and touched her, you know. And, you know, that was bad. You know, I was like what. Really, I was shocked. I was shocked. And I said okay. And that's what I got from it at first. And she said now promise you won't tell, and I promised, you know. And I told her I loved her, and I hung up.
>
> Right as soon as I hung up, you know, I was like, Mom, you won't believe this, you know. And I don't cry. I don't cry. It's not me. I don't cry. And I bawled. I couldn't believe what I had heard. To this day I can't. But I did, I cried, and I told my mom. And I was going to tell [the victim's mother] because I felt, you know, she told me, so I should be the one to tell [the victim's mother]. I couldn't I couldn't go through with it. I was on the phone, though, when my mom told [the victim's mother]. And, you know, it was just horrible.

Cody testified that the victim's mother "broke down" and began screaming when his mother told her Defendant had molested the victim.

Cody testified that he did not tell the victim what to say, and he was not aware of any conspiracy between his mother and the victim's mother to make up the story. He said that after the victim disclosed that Defendant had touched her, he told the victim that he had also been molested. Cody testified that he knew Defendant very well, and he was fun to be around. He was not afraid of Defendant, and the victim did not seem afraid of him.

Corporal Derek Oeser of the Rutherford County Sheriff's Department testified that on July 13, 2003, he was dispatched to a "possible child abuse" call at the victim's mother's home. He spoke with the victim and her mother, and the victim told him that Defendant had molested her. Corporal Oeser testified that the victim indicated that she "confided some information to her cousin and that her cousin came back and told her mother." The victim told him that during the last incident, Defendant entered her room while she was "asleep on a makeshift mat in her bedroom down on the floor." She said that she kept her eyes shut and pretended to be asleep when Defendant walked into the room wearing a bath towel. The victim told Corporal Oeser that Defendant then "laid down beside her and had fondled her breasts, her buttocks, and her genitals." He said:

> She did state that there were previous times. She didn't go into any real specifics. She was very upset. She was crying. She was scared. She was timid during the interview. She had stated that there were other episodes, and I asked her if the episodes had increased over a period of time or with intensity, and she said yes.

-6-

Corporal Oeser testified that he asked the victim if there was any penetration, and she said that Defendant penetrated her with his fingers. The victim told him "this time, that like the other times, she kept her eyes shut. She pretended to be asleep and sometimes pushed his hands away."

Corporal Oeser testified that he ended the interview because the victim became so distraught. He did take a written statement from her. Corporal Oeser then notified Sergeant Allen Jones of the situation who instructed him to notify the Department of Children's Services (DCS). Sergeant Jones then notified the "detective division, and the liaison between the initial reporting officer and the other organizations and the other divisions within our department took place. The investigation [then] started."

Detective David Hailey of the Rutherford County Sheriff's Department testified that he was assigned to the case on July 14, 2003. He immediately contacted Sharonica Nelson with DCS, and they set up an appointment to meet with the victim. They met the victim and her mother at her mother's residence. Detective Hailey testified that the victim seemed very nervous during the interview, and she gave a taped statement. The victim mentioned an incident during a *Star Wars* movie, and she indicated that it occurred two or three years prior to the interview. Detective Hailey testified that the victim wanted to confront Defendant, and he "let them know that [he] couldn't have her do that in person." It was his idea for the victim to confront Defendant by phone and record the conversation.

Detective Hailey testified that the phone call took place at the victim's friend's residence. The victim was in the kitchen, and her mother and brother were in a back bedroom along with the friend's mother. Sharonica Nelson and Detective Hailey were sitting on a couch in the livingroom. He said: "I put [the victim] with her back to me so she would not have to look at me and she would not have to look at Sharonica. And I told her just to be herself because she wanted to do the confrontation." Detective Hailey testified that he told the victim things that he needed, and he went into the kitchen on occasion and wrote things on "little stickies." On the notes, he would remind her of details and ask if she was ok. He said that the victim became upset during the interview, and Ms. Nelson went into the kitchen a couple of times to check on her. Detective Hailey testified that the phone conversation lasted between thirty and forty-five minutes, and the victim's mother never went into the kitchen during the call.

Detective Hailey testified that he then listened to the tape of the conversation and decided that he needed to interview Defendant. He and Ms. Nelson set up an interview with Defendant at the Sheriff's Office on July 14, 2003. Detective Hailey testified that the recorded interview lasted two and a half to three hours. Defendant then gave a written statement containing the following in pertinent part:

July 5th, I was drinking pretty much all day. That night I went into [the victim's] room and petted her, brushed her hair, scratched her back. And in a statement the detective told me [the victim] said I touched her in a way that made her feel like it was wrong. I don't think I did it to be sexual, just to be loving.

In the statement, Defendant also indicated that the victim always told the truth, so he would believe what she said. He also said that he would not drink again if it was causing him to be "over affectionate." During the interview, Detective Hailey testified that Defendant never mentioned the phone call with the victim, and when Detective Hailey brought it up, Defendant indicated that the call was a couple of minutes long, and he and the victim talked about her boyfriend. Detective Hailey then placed Defendant under arrest. Detective Hailey testified that he interviewed Defendant on more than one occasion, and Defendant later sent "inmate requests" to him requesting further communication. Defendant never indicated that he was coerced into saying anything. However, he suggested that the victim's mother had something against him. Detective Hailey testified that he searched Defendant's house after the first interview, but did not find any incriminating evidence.

Detective Hailey testified that he interviewed the victim again in his office on July 22, 2003. He said that "she was open and seemed better able to talk about it." The victim gave him more information and was "able to explore more some of the things that she had said earlier, too." Detective Hailey thought that digital penetration was mentioned in the first interview with the victim, and there was a discussion about an orgasm in the second interview. He said that he did not tell the victim what to say, and to his knowledge, no one else told her what to say. Detective Hailey then sent the victim to Our Kids for a more thorough examination. He did not tell the victim that he would prosecute her if she changed her story, but he made that statement to Defendant during an interview to persuade him to tell the truth.

Sue Ross, a Pediatric Nurse Practitioner with the Our Kids Center in Nashville, Tennessee, testified that she examined the victim who had given a statement about a month earlier implicating Defendant as the perpetrator of the offenses against her. Ms. Ross testified that the victim's examination was normal, and there was no breaking of her hymen. She explained that it was rare to have any kind of physical "findings secondary to digital penetration in an adolescent or pubescent child." Ms. Ross saw nothing to say that the victim had been penetrated. She explained that her primary purpose was to determine if the victim was medically healthy, not if penetration occurred. She also did not usually testify about whether a child was lying. Ms. Ross testified that she found nothing inconsistent with what the victim told her. The victim told Ms. Ross that she had used tampons, which indicated that she was more likely to know the difference between penetration in the labia versus penetration in the vagina.

Ms. Ross testified that technique in interviewing a child is the most important aspect in the discovery of sexual abuse. She said that it is possible for a child to remain asleep while someone is penetrating them with their fingers, and some children use sleeping as a defense mechanism. Ms. Ross said that in the victim's case, given her anatomy, it would have been possible for an adult's two fingers to penetrate her vagina without causing pain. She also said that it was possible for a fourteen-year-old to have an orgasm; however, they might not know what an orgasm is.

J.D. Turner, Defendant's brother, testified that he had heard the victim's mother, in the victim's presence, discuss being molested by her father in the past. Mr. Turner said that he "never cared for" the victim's mother, and his wife had a physical altercation with her. He testified that Defendant "pulled her off the wife and held her away from her while we got our stuff and went to a motel."

Mr. Turner testified that after Defendant's arrest, he went to Defendant's house to pick up his personal belongings, including a pistol that Mr. Turner had allowed Defendant to borrow. He said that the victim's mother and her husband finally gave him the pistol, and "a briefcase full of bills." He testified that the victim told him that Defendant's clothes were "rags, they're gone, and there's nothing else." Mr. Turner testified that he attempted to get Defendant's van but the victim's mother indicated that she needed it for "her babies." He was aware that Defendant temporarily gave the victim's mother the keys to the van. Mr. Turner testified that he spoke with Detective Hailey several times and that Detective Hailey indicated that he would prosecute the victim "to the fullest extent of the law" if she changed her story.

Mr. Turner testified that Defendant was very affectionate with the victim and her brother and that he was constantly hugging them. He also said that they were "all over each other" and would all sleep together. Mr. Turner never got the impression that the victim was afraid of Defendant. He said Defendant never disciplined the victim or her brother for any reason, and he was their "buddy." Mr. Turner admitted that for two or three years prior to the offenses, he only saw Defendant, the victim, and her brother twice a year. He said that Defendant took the victim and her brother skating every Friday night and then picked them up. He thought that the victim hated Defendant's drinking. Mr. Turner was aware that Defendant had the victim's mother arrested for theft.

At trial, Defendant identified copies of checks from his checking account. He identified his signature on all of the checks except one which was written on July 23, 2003, eight days after his arrest, to the victim's mother. He said that he had seen the victim's mother forge his name to checks in the past; however, he did not prosecute her. Defendant testified that he gave the victim's mother the keys to his van because he went to jail "with an exploded brain." She told him that her car broke down, and she needed the van "for the

babies." Defendant said that the title to the van was in his name, and he never signed it over to anyone for the van to be sold. He did not know that the victim's mother and her boyfriend would move into the house after his arrest.

Defendant testified that when the victim confronted him, he knew that she was upset with him about something and that she had been upset with him for a long time. He said that he told Detective Hailey that the phone call with the victim was two or three minutes long because he was embarrassed. Defendant testified, "I didn't think I was lying because I said, you know, she called me and she was saying wacky stuff." He knew that he was leaving out some information to Detective Hailey. Defendant admitted that he may have been overly affectionate to the victim and her brother and that he would "love them and hug them." He did not think that he had offended the victim or touched her in an offensive manner.

Defendant testified that he would rub cortisone on the victim's stomach, but he never claimed to have accidently touched her vagina. He said that on the night of July 4, 2003, the victim spent the night at a friend's house, and he picked her up the following day. Defendant felt that the victim's testimony was "one [lie] after the other." He admitted that his statement indicated that he may have touched or rubbed the victim on the night of July 5, 2003. He said, "I mean, she was saying something, so I was agreeing to whatever." However, Defendant said that he did not touch or rub the victim in a sexual way."

Defendant testified that around Easter of 2003, he thought that the victim was upset with him for accidently running over the family dog. Later that night, the victim, the victim's brother, and he all slept together in the same bed with the victim's brother in the middle. Defendant did not remember anything else about that night. He also did not remember anything about the June 2003 incident or anything that happened while watching a *Star Wars* movie. Defendant testified that one of the victim's friends spent the night at the house every weekend during the summer. Concerning the incident after the victim's seventh grade dance, Defendant testified that the victim was upset with him because he sewed up a slit in the side of the dress that she wore to the dance. He testified, "[s]he was mad because it didn't look as good, you know, as with the slit down the side." Defendant testified that after the dance, he picked the victim and two other girls up and took them skating. He did not remember anything after they got home, although he thought that someone spent the night at the house.

Defendant testified that he did not approve of the victim's boyfriend because he was almost eighteen, and the victim was fourteen, and he told the victim that she could not go out with the individual. However, Defendant said that he later learned that the victim was still seeing her boyfriend behind his back, and they had a big argument over the matter a week before his arrest. He again denied ever touching the victim in a sexual way.

-10-

Defendant testified that when the victim confronted him, he thought that she was talking about his drinking because she mentioned finding all the bottles. He also thought that she was mad over her boyfriend. Defendant did not remember her saying several times something about cutting her arms. However, he said that he would have known if the victim was cutting herself. When the victim said "I just need to know why you're doing this," Defendant said that he had been grumpy, depressed, and griping. He acknowledged that on the tape of the phone call, the victim asked why he touched her "down there,"and he responded, "Well, I don't mean to." However, he claimed that he was not listening to what she was saying at the time. He also said: "At that point, like I say, I believed her. I believed her on anything." Defendant indicated that he was dazed and just responding during the conversation. He remembered telling the victim that he was sometimes too affectionate and would not be that way anymore. Defendant also remembered saying "Honey, stop it" when the victim said that he stuck his fingers in her. He also asked if she wanted him to go to jail and said that he would go to jail if she sought help. Defendant did not believe the victim or her brother was afraid of him, and he denied throwing the victim's brother on the couch in anger. He testified that the victim never told him to stop coming in her room. He said that Detective Hailey told him that he would prosecute the victim "to the full extent of the law" if she changed her story.

**Analysis**

*A. Thirteenth Juror*

Defendant contends that the trial judge who presided over his trial did not perform his role as thirteenth juror. Therefore, he asserts that he is entitled to a new trial under *State v. Biggs*, 218 S.W.3d 643 (Tenn. Crim. App. 2006) because the successor judge cannot ratify the jury's verdict.

Tennessee Rule of Criminal Procedure 33(f) imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Rule 33(f) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment. *Id.* Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. *Moats*, 906 S.W.2d at 435.

In this case, Defendant argues that he is entitled to a new trial pursuant to *State v. Biggs*, 218 S.W.3d 643 (Tenn. Crim. App. 2006). In *Biggs*, statements by the presiding judge were ambiguous as to whether he approved the jury's verdict. *Id*. at 654. The judge said, "If that's the verdict of each and every one of you on the jury, would you so indicate by raising your right hand, please? All right. Thank you." *Id*. The judge then told the defendant, "Mr. Biggs, based on the finding of the jury that you are guilty of the lesser-included offense of aggravated sexual battery, it is the judgement of the Court that you are guilty of aggravated sexual battery." *Id*. This Court found that the successor judge was required to grant a new trial because the presiding judge did not rule as the thirteenth juror, as there were unresolved credibility issues. *Id*.

However, the present case is distinguishable from *Biggs*. Following the return of the jury's verdict, the presiding judge, who retired before the motion for new trial was heard, said: "Okay. Ladies and gentlemen, I appreciate your service for these three days. I'm sorry it took as long as it did. You certainly served your county and your civic duty well, and I appreciate it. You're excused. **I will accept the verdict**." The presiding judge clearly fulfilled his role as the thirteenth juror, and the successor judge was not required to grant a new trial. *See State v. Ernest L. McCormick*, No. 01C01-9502-CC-00027, 1995 WL 580854 (Tenn. Crim. App. Oct. 4, 1995) *no perm. app. filed* (Trial judge fulfilled duty as the thirteenth juror by saying, "I accept this verdict" after the jury returned a guilty verdict.); *State v. Blanton*, No. M2007-01384-CCA-R3-CD, 2009 WL 537558 (Tenn. Crim. App. March 4, 2009) *perm. app. denied* (Tenn. Aug. 24, 2009) (After hearing the jury's verdict, trial judge explicitly adopted the jury's verdict as thirteenth juror by saying: "Let the record reflect that the court adopts the jury's verdict and agrees with the jury's verdict as a thirteenth juror as to the return of the jury, one court of child rape and two counts of aggravated sexual battery."). Defendant is not entitled to relief on this issue.

### B. *Motion for New Trial*

Defendant argues that the successor judge erred in denying his motion for new trial because the judge determined that he had no jurisdiction because the motion for new trial was untimely. After trial, Defendant did not file a direct appeal and later filed a petition for post-conviction relief arguing that he received ineffective assistance of counsel. One of the grounds of the petition was that trial counsel failed to timely file a motion for new trial. The post-conviction court denied the petition; however, this Court concluded that Defendant was prejudiced by counsel's failure to either file a motion for new trial or a motion requesting leave to withdraw as counsel of record, and granted Defendant a delayed appeal. In the opinion, this Court stated:

Having resolved the other issues raised in this post-conviction petition appeal, we therefore remand this case to the Circuit Court for Rutherford County and direct the trial court to enter an order authorizing the Petitioner to file a motion for new trial. Therefore, the Petitioner may proceed with a delayed appeal in accordance with the Tennessee Rules of Appellate Procedure.

*State v. Timothy J. Turner*, No. M2008-00372-CCA-R3-PC, 2009 WL 1175116 at, *5 (Tenn. Crim. App. May 1, 2009) *no perm. app. filed*.

Thereafter, Defendant filed a motion for new trial on October 22, 2009. However, his only ground for relief was that the evidence presented against him at trial was insufficient to sustain the convictions. At the hearing, the trial court noted that it did not believe that it had jurisdiction to hear a motion for new trial more than thirty days after the final order was entered; however, it heard arguments by Defendant and the State on the motion for new trial. It also heard argument by Defendant that the trial court should grant him a new trial in its role as the thirteenth juror. This ground for relief was not included in the written motion for new trial. In the written order denying Defendant's motion for new trial, the trial court concluded:

> After review of the file, motions, and argument of counsel, this court finds it is without jurisdiction and denies the defendant's motion.
>
> The thirty-day filing deadline of a motion for new trial is mandatory, jurisdictional, and may not be extended. See Tenn. R. Crim. P. 33(b), 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn. Crim. App. 1997). Consequently, "[a] motion for new trial which is not timely filed is a nullity." *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989).
>
> The trial court may deny an untimely filed motion for new trial in order to allow the defendant a delayed direct appeal. The Supreme Court of this state has stated that granting a delayed appeal is the appropriate remedy when trial counsel failed to file a motion for new trial. *Wallace v. State*, 121 S/W/3d 652, 659 (Tenn. 2003). The Court of Criminal Appeal has instructed this court to provide the defendant, Timothy Turner, with such relief.

T.C.A. § 40-30-113 provides that a defendant may obtain a delayed direct appeal as follows:

> When the trial judge conducting a hearing pursuant to this part finds that the petitioner was denied the right to an appeal from the original conviction in violation of the Constitution of the United States or the Constitution of

Tennessee and that there is an adequate record of the original trial proceeding available for such review, the judge can:

(1) If a transcript was filed, grant a delayed appeal;

(2) If, in the original proceedings, a motion for a new trial was filed and overruled but no transcript was filed, authorize the filing of the transcript in the convicting court; or

(3) If no motion for a new trial was filed in the original proceeding, authorize a motion to be made before the original trial court within thirty (30) days. The motion shall be disposed of by the original court as if the motion had been filed under authority of Rule 59 of the Rules of Civil Procedure.

T.C.A. § 40-30-11(a)(2009). The State concedes, and we agree that the trial court was in error in determining that it was without jurisdiction to hear Defendant's motion for new trial because it should have disposed of Defendant's motion for new trial "as if the motion had been filed under authority of Rule 59 of the Rules of Civil Procedure." However, as pointed out by the State, this error is no basis for reversal. If a motion for new trial is **not** timely filed, an appellate court **will** still consider those issues that would result in a dismissal of the case, such as sufficiency of the evidence. Tenn. R. App. P. 3(e); *State v. Boxley*, 76 S.W.3d 381 (Tenn. Crim. App. 2001). The only issue raised in Defendant's written motion for new trial was sufficiency of the evidence to sustain the convictions, which would have been preserved for appeal even if Defendant had not timely filed a motion for new trial. Therefore, Defendant was not prejudiced by the trial court's erroneous ruling that the trial court did not have jurisdiction to hear the motion for new trial. Furthermore, the trial court allowed the "thirteenth juror" issue to be orally submitted, and we have addressed that issue in this appeal. Defendant is therefore not entitled to relief on this issue.

*C. Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support his convictions of sexual battery and sexual battery by an authority figure. More specifically, he argues that the victim's testimony was not credible.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d

166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Concerning sexual battery by an authority figure, T.C.A. § 39-13-527 provides:

(A) Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by the following circumstances:

(1) The victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen years of age; or

(2) The victim was, at the time of the offense, mentally defective, mentally incapacitated or physically helpless, regardless of age; and

3(A) The defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact; or

(B) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact.

Sexual battery is

unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act;

(2) the sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent;

(3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

(4) The sexual contact is accomplished by fraud.

Sexual contact is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the . . . person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Intimate parts include "the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2).

Defendant's four convictions of sexual battery and four convictions of sexual battery by an authority figure are related to five incidents: (1) in June of 2003 when Defendant walked into the victim's bedroom and rubbed her breasts and placed his fingers in her vagina; (2) in April of 2003 when Defendant performed oral sex on the victim after the family dog died; (3) after a seventh grade dance, Defendant performed oral sex on the victim while she was sleeping on the couch; (4) while watching a *Star Wars* movie, Defendant performed oral sex on the victim while she was sleeping on the floor; and (5) in July of 2003, Defendant entered the victim's bedroom and touched her breasts and vagina on top of her clothing. Defendant was charged only with rape and incest for the *Star Wars* incident, and only with sexual battery by an authority figure concerning the July 2003 incident.

Viewing the evidence in a light most favorable to the State, the proof established that the victim was born in September of 1988, and was between the ages of thirteen and eighteen when the offenses occurred. She lived with Defendant, who was her legal custodian, and he had supervisory and disciplinary power over her, which he used to accomplish the sexual acts. The victim testified that after one seventh grade dance, when she was thirteen, she was at home alone with Defendant. She was lying on the couch with her feet in Defendant's lap, and he was massaging her feet. The victim testified that she fell asleep, and when she woke up, Defendant was performing oral sex on her. She said that his mouth and tongue touched both the inside and outside of her vagina. The victim testified that in April of 2003, around Easter after the family dog died, the victim was asleep in the bed with her brother, who was sleeping in the middle, and Defendant. The victim testified that when she woke up later that night, her pants were down to her thighs, and Defendant was between her legs with his face

"down next to [her] vagina area." She said that his tongue and mouth were touching the outside and inside of her vagina, and she had an orgasm.

The victim testified that on another occasion in June of 2003, when she was fourteen, Defendant walked into her room while she was sleeping on the floor. He got underneath the covers and began rubbing her breasts and vagina underneath her clothing. He then placed his fingers in her vagina, which caused her pain, and he was "breathing hard." The victim testified that during a second occasion around July 4th or 5th of 2003, she was again sleeping on the floor in her bedroom when Defendant walked in, sat down next to her, and began raising the cover up to look at her bottom. The victim pulled the cover down, and Defendant left the room. He came back later and got underneath the cover with her and began rubbing her breasts and vagina on the outside of her clothing. In his statement to police, Defendant admitted that he entered the victim's room on July 5, 2003.

The victim testified that two or three years prior to her disclosure of the abuse, she was lying in the floor with her brother and Defendant watching *Star Wars*. After her brother fell asleep, Defendant performed oral sex on her. The victim guessed that Defendant thought she was asleep. She said that his tongue touched both the outside and inside of her vagina. The victim testified that she had seen Defendant get sexually aroused when he looked at her on one occasion while he was wearing a towel. She also testified that she had tried to lock her bedroom door, but the lock was broken.

Defendant asserts that that the jury did not accredit the victim's testimony since he was not convicted of the counts of the indictment involving penetration. However, the jury obviously accredited portions of the victim's testimony which is well within their prerogative. This Court had held, "[W]e recognize that jurors may use their common knowledge and experience in making reasonable inferences from the evidence." *State v. Meeks*, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993). The verdict resolved any conflicts in favor of the State. *See State v. Sommerall*, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). After a thorough review of the record, we find that there was sufficient evidence to convict Defendant of four counts of sexual battery and four counts of sexual battery by an authority figure.

Although not raised by Defendant or by the State, we find that Defendant's dual convictions for both sexual battery and sexual battery by an authority figure in counts five, six, and seven violate principles of double jeopardy. The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. Similarly, under our Tennessee Constitution, "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. Art. 1, § 10. "[W]hether two offenses are the 'same' for double jeopardy purposes depends upon a 'close and careful analysis of the offenses involved, the

-17-

statutory definitions of the crimes, the legislative intent and the particular facts and circumstances.'" *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996)(quoting *State v. Black*, 524 S.W.2d 913, 919 (Tenn. 1975).

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." *State v. Phillips*, 924 S.W.2d 662, 665 (Tenn. 1996). In determining whether two or more unlawful sexual acts may be the subject of separate conviction, our Supreme Court has suggested consideration of the following factors:

1. Temporal proximity-the greater the interval between the acts, the more likely the acts are separate;

2. Spatial proximity-movement or repositioning tends to suggest separate acts;

3. Occurrence of an intervening event-an-interruption tends to suggest separate acts;

4. Sequence of the acts-serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tend to suggest separate offenses; and

5. The defendant's intent as evidence by conduct and statements.

*State v. Barney*, 986 S.W.2d 545, 548-49 (Tenn. 1999).

The convictions in counts five, six, and seven related to three incidents of sexual abuse: (1) in June of 2003; (2) in April of 2003 after the family dog died; and (3) after a dance. The testimony by the victim demonstrated that for each incident, the offenses arose from one course of conduct that were not separate and discrete acts committed against the victim. Therefore, based on the factors set forth in *Barney*, we conclude that that dual convictions as to these counts violate double jeopardy principles. Accordingly, Defendant's convictions for sexual battery are merged into his convictions for sexual battery by an authority figure in counts five, six, and seven. *See State v. Banes*, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993)(Under the merger concept, the lesser conviction merges with the greater offense resulting in one judgment of conviction). We accordingly remand to the trial court for entry of amended judgments merging the sexual battery convictions with the convictions for sexual battery by an authority figure in counts five, six, and seven. We also note that the merger has no effect upon the effective eight-year sentence imposed by the trial court since the court ran two of the sentences for sexual battery by an authority figure consecutively, and the remainder of the sentences concurrently.

**CONCLUSION**

After a thorough review, we merge Defendant's convictions for sexual battery into his convictions for sexual battery by an authority figure in counts five, six, and seven of the indictment and remand to the trial court for entry of corrected judgments. Otherwise, we affirm the judgments of the trial court.

_____

THOMAS T. WOODALL, JUDGE