IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 23, 2013

## STATE OF TENNESSEE v. JONATHAN ANDREW DIETZ

**Direct Appeal from the Criminal Court for Putnam County**
**No. 09-0983     Leon C. Burns, Jr., Judge**

—————————————

**No. M2012-02560-CCA-R3-CD - Filed September 26, 2013**

—————————————

A Putnam County Grand Jury returned an indictment against Defendant, Jonathan Andrew Dietz, charging him with rape. After a jury trial, Defendant was found guilty as charged. The trial court sentenced Defendant to serve ten years at one-hundred percent in the Department of Correction as a violent offender. On appeal, Defendant argues that (1) the trial court improperly admitted a video of Defendant, according to the State, attempting to rub the victim's DNA off his genitalia while he was in the police interrogation room and (2) the evidence was insufficient to support his rape conviction. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J. and NORMA MCGEE OGLE, J., joined.

David N. Brady, District Public Defender; Marshall Judd, Kay Bradley, and Cynthia Lyons, Assistant Public Defenders, Cookeville, Tennessee, for the appellant, Jonathan Andrew Dietz.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall A. York, District Attorney General; Beth Willis and Anthony Craighead, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

The victim, A.H. (in order to protect the privacy of the victim, we will refer to her by her initials), testified that she met Defendant and his wife, Francis Dietz, in 2008, and she became friends with Mrs. Dietz. Defendant was friends with A.H.'s boyfriend at the time, and at some point, Defendant and Mrs. Dietz lived with A.H. and her boyfriend for approximately four months. Once A.H. and her boyfriend broke up, she no longer talked with Defendant and Mrs. Dietz.

On July 19, 2009, A.H. went to the Forbidden Bar with her brother and his fiancee. They arrived at approximately 11:00 p.m., and A.H. saw Defendant and Mrs. Dietz at the bar. Mrs. Dietz walked up to A.H. and began talking to her, and everyone eventually decided to sit together in a booth because Defendant and Mrs. Dietz had brought liquor. Defendant gave A.H., her brother, and her brother's fiancee shots of Jack Daniels and Jagermeister. A.H. drank "a little bit of both" and then left the booth to talk to other friends.

A.H. began dancing with friends when the bar began its "foam party" where bubbles and foam came down from machines in the ceiling over those who were dancing. Many people there were wearing their bathing suits. However, A.H. was wearing blue jeans and a "spaghetti-strap" shirt. A.H. danced with Mrs. Dietz, and Defendant was also out on the floor dancing. At some point, A.H. walked outside to the patio to look for her girlfriend Erika Coscia and to see if she saw any other friends. While A.H. was outside, Defendant walked up behind her and said something. A.H. testified: "I don't really remember exactly what he said, but all I know is, he ended - - I ended up seeing myself being pulled out and toward the exit by him." A.H. was intoxicated at the time, but she testified that she was not "stumbling drunk."

A.H. walked out to the parking lot with Defendant, with him pulling on her arm, and he indicated that he wanted to talk to her. A.H. trusted Defendant because he had never "hit on" her previously, and they got into a white car belonging to Greg Rogers' sister that was parked in the second row of the parking lot. A.H. sat in the passenger seat of the car and kept her foot out of the door in order to keep the door open because she was not planning to remain in the car for very long. Defendant sat in the driver's seat and shut the door.

Defendant began "acting differently" toward A.H., and she did not feel comfortable and wanted to leave. Defendant then reached over A.H. and shut the passenger door. A.H. had to pull her foot in so it would not get shut in the door. Defendant began "breaking up a substance," and then he put it away. "[O]ut of nowhere" Defendant began kissing A.H.,

and he attempted to get her to kiss him back but she refused because she "never once thought of him like that." A.H. attempted to open the door, but it was locked. Defendant then moved from the driver's seat and put his body on top of hers in the passenger seat which was leaned "pretty far" back. Defendant began kissing A.H.'s neck, and his hands were "everywhere" touching her legs, inner thighs, and breasts.

A.H. again tried to get out of the car, and she told Defendant to "please stop." Defendant continued to hold her down, and he told her to "shut up." A.H. attempted to bite Defendant but she could not because all of his weight was on her. Defendant then unbuttoned and unzipped A.H.'s pants but she kept her legs closed "tight together because [she] didn't want anything like that going on." A.H. was "pretty sure [Defendant] already had his pants unzipped, like he was getting ready for it." Defendant managed to get A.H.'s pants pulled down a little above her knees. He pulled her panties to the side and "tried to insert [himself] inside of [her]." When asked if Defendant successfully inserted himself inside of her, A.H. testified: "No. It touched a little bit, but he - - I didn't give him the chance to actually get to go full force. Do you know what I'm saying? Like, I was just fighting really hard . . . ." A.H. further testified that she could feel Defendant's penis "[r]ubbing on me down there" and that he slightly inserted himself. She said that Defendant "threatened to hit [her] and choke [her] and stuff." A.H. testified that she was yelling for someone to please help her. She said that Greg Rogers walked to the car at one point, and she "was screaming for him to please help [her]." However, Defendant told him to go away and that he would be back inside the club "in a little bit." Mr. Rogers walked away "like it was nothing."

Approximately five minutes later, Mrs. Dietz ran up to the car "hysterical," and she began shaking the vehicle and hitting the windows. A.H. testified that Defendant was still on top of her when Mrs. Dietz arrived and "threw his self [sic] off of [her] acting like nothing happened." Defendant unlocked the car door, and A.H. let herself out of the vehicle. Her pants were still down, and she had to hurry and pull them up because a crowd was gathering outside. At that point, A.H. was crying and shaking, and Mrs. Dietz and Greg Rogers' sister, Andrea, ran toward her and attempted to "jump her." A.H. fell to the ground, and ended up "getting hit on top of the head." At that moment, her girlfriend, Ms. Coscia, arrived and shielded A.H. from being hit any further. Ms. Cosica was hit several times by Mrs. Dietz and Mr. Rogers' sister, Andrea. A.H. denied being hit, kicked, or scratched on her legs, thighs, or arms by Mrs. Dietz.

Several deputies from the sheriff's department arrived, and A.H. talked with them and gave a written statement. She was then transported to the Genesis House. A.H. was examined by a nurse from head to toe and given antibiotics. She was also photographed and questioned about what happened at the club. However, A.H. said that she was "hysterical

and crying." When asked at trial if her vaginal area was sore during the exam, A.H. replied, "yes, pretty much, it was." A.H. had scratches on her arm and back, and she was bruised.

The following day, A.H. went to the sheriff's department and gave a second statement to Detective James Patterson, and her bruises and scratches were photographed. Detective Patterson also took a DNA swab from A.H.'s mouth. By that time, Detective Patterson had already spoken with Defendant, and he informed A.H. what Defendant said. A.H. identified certain bruises on her arm and inner thigh as caused by "[b]eing held down." She also had bruises on her back "like it had been rubbed up against . . . the seat." A.H. had scratches on her inner thigh from the zipper of Defendant's pants.

Julie Smith, a nurse practitioner with the Genesis House, testified that she was called at approximately 4:30 a.m. on July 19, 2009, to examine A.H.. When she arrived, A.H. was sitting in a patrol car crying, disheveled, and visibly upset. Ms. Smith walked into the Genesis House with A.H., and they began filling out paperwork. Ms. Smith asked A.H. what happened. A.H. said that she and Defendant had been sitting in the car and that he closed the door and threatened her with physical assault. A.H. also told Ms. Smith that Defendant held her down, and "vaginal penetration occurred." Ms. Smith examined A.H.'s vaginal area and noted redness on her cervix. She explained that the redness was consistent with blunt force trauma. Ms. Smith also swabbed A.H.'s external and internal genitalia.

During her examination of A.H., Ms. Smith noticed bruises on A.H.'s body. Some of the bruises appeared to be "newer," and some appeared be preexisting. Ms. Smith testified that A.H. had "linear abrasions" on her spine that matched A.H.'s statement that "she was in the car seat and was on the bottom of the car seat, she was on the bottom, and that there had been friction [that] occurred with the struggle." Concerning A.H.'s behavior while at the Genesis House, Ms. Smith noted the following: "Very upset. Tearful. Difficult to get through the physical exam. Obviously wanting to change clothes, shower, those kinds of things that are pretty typical for a sexual assault victim."

Detective James Patterson of the Putnam County Sheriff's Department was assigned to investigate the present case. He interviewed Defendant at 7:55 a.m. on July 19, 2009, after Defendant had been taken into custody for public intoxication. Defendant was advised of his *Miranda* rights, and he agreed to give a statement. The interview was video recorded. Detective Patterson told Defendant that A.H. alleged that a sexual assault had taken place and that Defendant had penetrated her with his penis. Defendant denied the accusations. He told Detective Patterson that he and A.H. went out to the car, and she was flirting with him and making advances toward him. Defendant said that he and A.H. began kissing and that he got into the seat with her. However, he denied that any clothing was removed or that there was any sexual act or penetration.

-4-

At some point, Detective Patterson asked Defendant to consent to a "penile swab" in order to prove his side of the story, and Defendant agreed. Detective Patterson then left the interview room to get the swab. While he was gone, Defendant was still being video recorded. Detective Patterson then took a penile swab from Defendant, and he also took another swab from Defendant's mouth. After the interview, Detective Patterson reviewed the video tape of the interview. A portion of the video was played for the jury. On the video, Defendant is seen licking his hand, placing it inside his pants, and rubbing his genitals in what the State claimed was an attempt to remove A.H.'s DNA before Detective Patterson took the penile swab.

Special Agent Jennifer Shipman, a forensic scientist with the Tennessee Bureau of Investigation DNA and Serology Laboratory, examined the DNA swabs taken from A.H. and Defendant in this case. She found A.H.'s DNA on Defendant's penile swab and testified that the probability of an unrelated individual having the same DNA profile exceeded the current world population.

Francis Dietz, Defendant's wife, testified that she and Defendant had been married since July 5, 2008. On the night of July 19, 2009, she was inside the Forbidden Club when Amber Roberts told her that Defendant was outside in a car. She and Ms. Roberts walked out to the vehicle, and Mrs. Dietz saw Defendant "on top of [A.H.], naked." Mrs. Dietz opened the car door, dragged A.H. out of the vehicle, and beat her. She said that A.H. did not say anything at first, but then A.H. "started screaming rape." On cross-examination, Ms. Dietz testified that A.H. had her pants down and that she saw Defendant attempting to penetrate A.H. "with her legs willingly in the air." Ms. Dietz admitted that she was intoxicated at the time.

## II. Analysis

### A. Admission of Video Tape

Defendant argues that the trial court erred in admitting the video of his interview at the sheriff's office in which he is seen licking his hand, placing it inside his pants, and rubbing his penis in an apparent attempt, according to the State, to clean himself prior to the penile swab being taken by Detective Patterson. The State argues that the issue is waived because Defendant failed to "argue a specific ground for his objection either at trial or in his motion for new trial." We disagree. The record reflects that prior to trial, Defendant objected to the evidence. The following exchange took place:

THE COURT:          I think before we bring our jury in, we had an issue in regards to the playing of a tape, or disc, or video or something? Mr. Judd?

[TRIAL COUNSEL]:    Yes, Your Honor. This shows the - - it shows the defendant allegedly having contact with his private parts from his hand to his mouth to his private parts, and we would object to it as being inflammatory, prejudicial to the defendant. I think - - we would probably object to it, but I understand that the state may be able to have it testified to. But as far as pictures, we think that would be prejudicial.

                    *       *       *

[TRIAL COUNSEL]:    Unless there's some medical proof here today that would show that that would affect anything, we would still object to it.

The trial court overruled the objection and held that "under the circumstances" the evidence was admissible. Trial counsel renewed the objection to the evidence during trial when the State asked to play the video for the jury. The issue was again raised in the Defendant's motion for new trial. Therefore, it is not waived.

In any event, the trial court properly admitted the evidence. Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)).

In this case, as argued by the State, the video of Defendant licking his hand and rubbing it on his genitals before the "penile swab" was relevant to show that Defendant had guilty knowledge that he had raped the victim and that he was attempting to remove the

victim's DNA from his penis. *See State v. Brewer*, 932 S.W.2d 1, 24 (Tenn. Crim. App. 1996)("[E]vidence was relevant to show that the appellants had guilty knowledge that the interests they were selling were securities."). Moreover, the probative value of the video evidence was not outweighed by the risk of unfair prejudice. The State had the burden of showing that Defendant raped the victim. Rape is defined as the unlawful sexual penetration of the victim by a defendant accompanied by force or coercion. Tenn. Code Ann. § 39-13-503(a)(1). Defendant told Detective Patterson that he only kissed the victim, and he denied that any clothing was removed or that there was any sexual act or penetration. However, Defendant's acts on the video suggest otherwise. We also note that the trial court did not allow Detective Patterson to narrate to the jury what he thought Defendant was doing on the video. The trial court allowed the jury to draw their own conclusions as to what the video depicted. Therefore, the trial court did not abuse its discretion when it admitted that portion of the video into evidence. Defendant is not entitled to relief on this issue.

### B.  Sufficiency of the Evidence

Defendant argues that the evidence presented at trial was insufficient to support his conviction for rape because there was no evidence that penetration occurred. We disagree.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Rape is defined as "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances," some of which are "[f]orce or coercion is used to accomplish the act" or "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." T.C.A. § 39-13-503(a)

(2009). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, **however slight**, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . emission of semen is not required." T.C.A. § 39-13-501(7)(emphasis added).

The evidence, taken in a light most favorable to the State, shows that Defendant sexually penetrated the victim. A.H. testified that Defendant pulled her panties to the side and "tried to insert [himself] inside of [her]." When asked if Defendant successfully inserted himself inside of her, A.H. testified: "No. It touched a little bit, but he - - I didn't give him the chance to actually get to go full force. Do you know what I'm saying? Like, I was just fighting really hard . . ." A.H. further testified that she could feel Defendant's penis "[r]ubbing on me down there" and that he **slightly inserted** himself into her vagina. She said that Defendant "threatened to hit [her] and choke [her] and stuff."

Julie Smith, the nurse who examined A.H. at the Genesis House after the rape testified that the victim had redness on her cervix during the examination. Ms. Smith explained that the redness was consistent with blunt force trauma. Special Agent Shipman testified that she found the victim's DNA on Defendant's penile swab that had been taken by Detective Patterson at the sheriff's department after Defendant had been taken into custody.

The jury obviously accredited the victim's testimony to establish that Defendant sexually penetrated her. The evidence was sufficient to support Defendant's conviction for rape. Defendant is not entitled to relief on this issue. For the foregoing reasons, the judgment of the trial court is affirmed.

THOMAS T. WOODALL, JUDGE